IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 114,373

STATE OF KANSAS,
*Appellee*,

v.

MARTIN K. MILLER,
*Appellant.*

SYLLABUS BY THE COURT

1.

Both the Sixth Amendment to the United States Constitution and the Kansas Constitution Bill of Rights, § 10 guarantee an accused the right to a trial by an impartial jury. A constitutional change of venue challenge based upon the claim that pretrial publicity has denied an accused the right to trial by an impartial jury is reviewed under two contexts: presumed prejudice and actual prejudice. Each context involves a different review standard and test.

2.

When pretrial publicity is so pervasive and prejudicial that a court could not reasonably expect to find an unbiased jury pool in the community, the law presumes the defendant's right to a fair and impartial trial has been prejudiced. In such presumed prejudice cases, the trial judge can transfer the venue of the jury trial to another locale without establishing the level of actual prejudice through voir dire.

3.

When determining whether to presume prejudice from publicity in this state, courts employ the seven factors set forth in *Skilling v. United States*, 561 U.S. 358, 380-85, 130 S. Ct. 2896, 177 L. Ed. 2d 619 (2010), to-wit: (1) media interference with courtroom proceedings; (2) the magnitude and tone of the coverage; (3) the size and characteristics of the community in which the crime occurred; (4) the amount of time that elapsed between the crime and the trial; (5) the jury's verdict; (6) the impact of the crime on the community; and (7) the effect, if any, of a codefendant's publicized decision to plead guilty.

4.

The district court's ruling on a change of venue request based upon presumed prejudice is subject to a mixed standard of review. The appellate court looks for substantial competent evidence in the record to support the district court's factual findings on the *Skilling* factors, but the overall weighing of the *Skilling* factors involves a conclusion of law subject to a de novo review.

5.

A change of venue based on actual prejudice is appropriate when the voir dire testimony during jury selection and the record of publicity reveal the kind of wave of public passion that would make a fair trial unlikely by the impaneled jury.

6.

The appellate standard of review of a district judge's decision on actual prejudice as a basis for a change of venue is abuse of discretion. A district judge's ruling that a juror can set aside pretrial publicity and decide the case on the evidence is entitled to special deference.

7.

The determination of actual prejudice involves the consideration of nine factors: (1) the degree of publicity circulated through the community; (2) the degree the publicity circulated through areas to which venue could be changed; (3) the length of time from the dissemination of the publicity to the trial date; (4) the care exercised and ease encountered in jury selection; (5) the familiarity with publicity and its resultant effects upon prospective jurors or trial jurors; (6) challenges exercised by the defendant in jury selection, both peremptory and for cause; (7) the connection of government officials with the release of the publicity; (8) the severity of the offense charged; and (9) the particular size of the area from which the prospective jurors are drawn.

8.

The district court's denial of a request to excuse a prospective juror for cause is reviewed on appeal for an abuse of discretion. The party requesting the for-cause challenge of a prospective juror bears the burden of proving the denial of the challenge was an abuse of discretion.

9.

The district court's erroneous failure to excuse a prospective juror for cause does not constitute a ground for reversal of a conviction unless the defendant can show that he or she was prejudiced as a result of the error. The loss of a peremptory challenge does not constitute the prejudice required to reverse a conviction for an erroneous denial of a for-cause juror challenge. Moreover, an erroneous denial of a party's for-cause challenge of a prospective juror will not be reversible if the party could have cured the error by exercising a peremptory challenge to strike that juror.

10.

A juror's knowledge that the accused was previously convicted for the same crime being prosecuted in the current case is not inherently prejudicial, and such knowledge will not automatically disqualify the juror from serving at a retrial of that crime.

11.

The bifurcation provisions in K.S.A. 2017 Supp. 60-242(b) are inapplicable with respect to the separate elements of a single crime.

12.

A trial court should not give a requested jury instruction that is not legally appropriate.

13.

A district court's decision on a motion to disqualify an attorney is reviewed for an abuse of discretion. Discretion is abused if a court bases its decision on a mistake of fact or a mistake of law or if no reasonable person would take the court's position.

14.

Appellate courts exercise unlimited review of the particular facts and circumstances of each case to determine whether judicial comments, other than jury instructions, rise to the level of judicial misconduct.

15.

K.S.A. 60-404 generally precludes an appellate court from reviewing an evidentiary challenge absent a timely and specific objection to the admission of evidence made on the record when the evidence is presented at trial.

16.

A trial court's denial of a motion for mistrial is reviewed on appeal under an abuse of discretion standard. Appellate review of a trial court decision on a motion for mistrial looks first at whether there was a fundamental failure in the proceeding. If so, the appellate court considers any curative or mitigating action by the trial court and determines whether the failure in the proceedings resulted in an injustice.

17.

The use and scope of rebuttal evidence rests in the sound discretion of the trial court, and its ruling will not be reversed unless it appears that discretion has been abused to the prejudice of the defendant.

18.

In reviewing the admissibility of evidence, a court first determines whether the challenged evidence is relevant, i.e., whether the evidence is probative and material. Evidence is material when the fact it supports is in dispute or in issue in the case; evidence is probative if it has any tendency to prove any material fact. The trial court's determination that the evidence is probative is reviewed for an abuse of discretion; materiality is subject to de novo review. If the evidence is relevant, the court then determines, de novo, which rules of evidence or other legal principles apply. Appellate review of the trial court's application of the applicable legal rules and principles depends upon whether the rule or principle permits the trial court to exercise its discretion (abuse of discretion review) or whether the rule raises questions of law (unlimited review).

19.

Courts adhere to the law of the case doctrine to accomplish multiple goals:  to avoid indefinite relitigation of the same issue; to obtain consistent results in the same litigation; to afford one opportunity for argument and decision of the matter at issue; and to assure the obedience of lower courts to the decisions of appellate courts.

20.

K.S.A. 2017 Supp. 22-3212(i) gives a district court in a criminal case the option of a broad array of sanctions for discovery violations. Consequently, the sanction imposed is reviewed on appeal under an abuse of discretion review standard, so long as due process rights are not implicated.

21.

Even if no individual trial error is sufficient to require a reversal of a conviction, the cumulative effect of multiple errors may be sufficient to deny a defendant a fair trial. The test for reversibility based on cumulative error is whether the totality of the circumstances establish that defendant was substantially prejudiced by the cumulative effect of the multiple errors, thus denying the defendant a fair trial. In assessing the cumulative effect of errors during the trial, the appellate court examines the errors in the context of the entire record, considering how the trial judge dealt with the errors as they arose; the nature and number of errors and their interrelationship, if any; and the overall strength of the evidence.

Appeal from Douglas District Court; PAULA B. MARTIN, judge. Opinion filed October 5, 2018. Affirmed.

*Richard Ney*, of Ney, Adams & Miller, of Wichita, argued the cause, and *David L. Miller*, of the same firm, was with him on the briefs for appellant.

*Andrew D. Bauch*, assistant district attorney, argued the cause, and *Kate Duncan Butler*, assistant district attorney, *Charles E. Branson*, district attorney, and *Derek Schmidt*, attorney general, were on the brief for appellee.

PER CURIAM: Martin K. Miller appeals his latest conviction by a Douglas County jury for the premeditated first-degree murder of his wife, Mary Miller. He was first

convicted of the murder in 2005, and that jury verdict was affirmed by this court. *State v. Miller*, 284 Kan. 682, 163 P.3d 267 (2007) (*Miller I*). In 2012, the Court of Appeals granted Miller's motion for postconviction relief and ordered a new trial. *Miller v. State*, No. 103,915, 2012 WL 401601, at *9 (Kan. App. 2012) (unpublished opinion). This court affirmed the Court of Appeals' decision to order a new trial. *Miller v. State*, 298 Kan. 921, 940, 318 P.3d 155 (2014) (*Miller II*). Upon retrial, the new jury also convicted Miller of premeditated first-degree murder, and, again, he directly appeals to this court. K.S.A. 2017 Supp. 22-3601(b)(3) (appeal of life sentence in murder case taken directly to the supreme court).

Miller raises 10 issues in this appeal, albeit we take the liberty of consolidating or separating the issues when we see fit to do so, as well as rearranging the order in which we address them. Ultimately, we affirm Miller's conviction and his hard-25 life sentence.

FACTUAL AND PROCEDURAL OVERVIEW

The morning of July 28, 2004, Miller called police to report that he had found his wife dead in their bedroom. He contended that she died of natural causes, but the State prosecuted Miller on the theory that he had strangled his wife to pursue a "double life" that included an extramarital affair and an obsession with pornography.

In 2005, following a well-publicized trial in Douglas County District Court, a jury convicted Miller of premeditated first-degree murder. Notwithstanding the trial court's erroneous admission of some pornography evidence, this court affirmed the conviction on direct appeal in 2007.

The following year, Miller filed a K.S.A. 60-1507 motion for postconviction relief alleging that both his trial counsel and his appellate counsel had provided unconstitutionally defective representation. The district court denied the motion. But

7

on appeal, the Court of Appeals concluded that Miller's appellate counsel performed below constitutional standards by failing to find and assert a structural error in the burden of proof jury instruction. *Miller*, 2012 WL 401601, at *8. This court affirmed the reversal of Miller's conviction and remanded for a new trial, holding "that appellate counsel's failure to challenge the written instruction was objectively unreasonable and prejudicial," because "[t]he incorrect jury instruction constituted structural error." *Miller II*, 298 Kan. at 923.

Miller's retrial began March 30, 2015. The jury heard testimony from the police officers who had responded to Miller's 911 call. The officers found Mary lying in her bed and determined that she was dead. An officer heard the Millers' 14-year-old daughter, Melodie, relate to her father that she had awakened during the night to hear her mother scream and her father's voice. When Miller denied being in Mary's room, the officers separated Miller, Melodie, and the Millers' 11-year-old son, Matthew, for individual interviewing.

The officers related that Miller told them that he had gone to bed around 11 p.m.; that Mary joined him after he was asleep; and that he got out of bed around 2 a.m. with a severe headache and a pain in his hip. After taking aspirin, he fell asleep in the living room recliner, until he was awakened by Mary's alarm clock at 6 a.m. He said that he did not attempt to resuscitate her, but instead called the police.

Melodie testified at trial that she had been on her computer until midnight. She heard someone come out of her parents' bedroom, go into Miller's office, and turn on the computer. She assumed it was her father. Melodie said that, during the night, she awoke to hear her mother screaming, multiple times, "No, please don't. No." She also heard her father saying, "Shh. Calm down. It's gonna be all right." When Melodie was again awakened by sirens, she went to her parents' room to find her mother on the bed and her father crying. He told her that he did not believe Mary was alive.

8

Matthew testified at trial that he also woke in the middle of the night and heard his mother "screaming." He said her voice sounded "labored, or like she couldn't get enough breath in." Matthew also heard Miller saying, "Calm down. Calm down. Everything's gonna be alright." After the noise stopped, he observed Miller walk down the hall.

Melodie also testified regarding Miller's relationship with Carrie Lester (formerly Parbs), which she deemed to be inappropriate. Lester also testified at trial, relating in detail her four-year sexual affair with Miller. Lester also testified about Laura Miller (formerly Cuthbertson), who subsequently had a romantic relationship with Miller and eventually became Miller's wife.

Unlike his first trial, Miller elected not to testify in his own defense. The State, over Miller's objection, moved on the first day of trial to admit Miller's testimony from the first trial. After giving Miller the opportunity to argue the legal basis upon which his prior testimony was inadmissible at retrial, the trial court permitted a redacted version to be read to the jury.

In his first trial testimony, Miller said that he retired to bed around 11 p.m., but got up around midnight with hip pain. After checking on Melodie and turning off her laptop, he went to the kitchen for his medicine. While waiting for the medication to take effect, he briefly did a search on his computer with the terms, "[s]leep patterns" and "deep sleep patterns." He then fell asleep on the living room recliner until about 3 a.m., when he arose to go to the master bathroom, where he believes he fell asleep on the toilet. Later, he was awakened by Mary making "an outburst of sound." He went to Mary, telling her to calm down and breathe. When her breathing became normal, he returned to the living room to go back to sleep.

9

Dr. Erik Mitchell, the forensic pathologist who first examined Mary at her home and later performed the autopsy, testified at the retrial. At the home, Dr. Mitchell had observed petechiae in Mary's eyes and white foam, or edema, coming from her nose. He did not observe any other external injuries. Dr. Mitchell testified that a "[v]ery high percentage of people with strangulation [deaths] have the petechiae," and he explained that edema frequently occurs in asphyxia deaths. During the autopsy, Dr. Mitchell discovered a flame hemorrhage of the sternohyoid muscle at the level of the voice box and believed that this condition was caused by physical injury or pressure to the area. Dr. Mitchell also discovered some bruising to Mary's scalp as a result of physical trauma that had occurred within a day or two of death.

Dr. Mitchell concluded that Mary had died from asphyxiation, as a result of compression to her neck applied by another person. He classified her death as a homicide and clarified that the results of the investigation into her death played a role in his ultimate conclusion.

Miller called two experts to offer contrasting, alternate explanations for Mary's death. Dr. Cyril Wecht testified that the lack of any external injuries on Mary or Miller, as well as Mary having an intact hyoid bone and no cyanosis or discoloration of her face, did not support a finding of strangulation. Dr. Wecht believed Mary likely died of a natural cause such as from stress-induced cardiomyopathy, or difficulty breathing, which usually occurs in postmenopausal women, or from a seizure or anaphylactic shock from the herbal remedies and medications found in the home. The other expert, Dr. Ivan Osorio, opined that Mary died from a prolonged epileptic seizure, explaining that her injuries were consistent with this type of convulsion and that an "epileptic cry," which can be words or sounds, is invariably the first visible and audible manifestation of an epileptic convulsion. Dr. Osorio thought Mary's history of suffering migraines and possible use of ginseng increased her likelihood of having a seizure.

10

In response, the State presented the rebuttal testimony of its expert, Dr. Kris Sperry. Dr. Sperry disagreed with both of the defense experts' opinions.

The State employed the same "double-life" theory on retrial to explain Miller's motive to kill his wife. The State contended that Miller's public persona was that of a church-going family man who coached the girls' volleyball team, while privately he had been involved in an extramarital sexual relationship with Lester for four years and was active on a number of internet dating sites. The State argued that Miller got rid of his wife to pursue his more passionate life, financed by Mary's $300,000 life insurance policy.

Procedurally, before the retrial, Miller moved for a change of venue, arguing that the public's knowledge of his first trial prejudiced him and prevented a fair trial in Douglas County. Miller also filed a motion to disqualify the Douglas County District Attorney's Office (DA) from prosecuting his case, claiming that a prosecutor's relationship with Miller's son created a conflict of interest and that the DA's Office had come into possession of privileged information. Both motions were denied.

Miller also filed multiple motions in limine, seeking to exclude evidence the State intended to offer to establish Miller's motive. Miller argued, in part, that his willingness to stipulate to the element of motive and intent of the crime charged rendered the evidence of motive irrelevant. At the same time, Miller also filed a motion to bifurcate under K.S.A. 2017 Supp. 60-242(b), seeking separate trials with the same jury on the different elements of premeditated first-degree murder.

The trial court ruled that the State did not have to accept Miller's stipulation and that evidence surrounding Miller's extramarital affair, Mary's life insurance, and Miller's internet dating profiles was admissible to prove motive. The trial court also denied Miller's motion to bifurcate.

11

Ultimately, the retrial jury convicted Miller of the premeditated first-degree murder of his wife, and he directly appeals to this court. As noted, although we address all of the issues Miller raises on appeal, we structure them differently for our analysis.

## CHANGE OF VENUE

We begin with Miller's challenge to the district court's denial of his motion to change the venue of the retrial, because if we agree with Miller's claim that he was unconstitutionally denied a trial by an impartial jury, we must send the case back to the district court for yet another trial.

Miller bases his claim on the extensive publicity surrounding the first trial and the corresponding pretrial publicity on retrial. He contends that the pervasive publicity denied him the constitutional right to a trial by an impartial jury, guaranteed by both the Sixth Amendment to the United States Constitution and the Kansas Constitution Bill of Rights, § 10. He does not assert that the district court's ruling contravened our change of venue statute, K.S.A. 22-2616(1).

A constitutional change of venue challenge based on pretrial publicity is reviewed under two contexts: presumed prejudice and actual prejudice. *State v. Hudgins*, 301 Kan. 629, 641, 346 P.3d 1062 (2015); see also *State v. Carr*, 300 Kan. 1, 56, 331 P.3d 544 (2014) (discussing the constitutional right to trial by an impartial jury), *rev'd and remanded on other grounds* 577 U.S. __, 136 S. Ct. 633, 193 L. Ed. 2d 535 (2016). Miller claims both presumed prejudice and actual prejudice. Each context involves a different review standard and test.

*Presumed Prejudice*

When pretrial publicity is so pervasive and prejudicial that a court could not reasonably expect to find an unbiased jury pool in the community, the law presumes the defendant's right to a fair and impartial trial has been prejudiced. See *State v. Robinson*, 303 Kan. 11, 74, 363 P.3d 875 (2015). In such presumed prejudice cases, the trial judge can transfer the venue of the jury trial to another locale without establishing the level of actual prejudice through voir dire, i.e., through the process of questioning prospective jurors. See *State v. Roeder*, 300 Kan. 901, 908-09, 336 P.3d 831 (2014) (citing *Carr*, 300 Kan. at 57).

*Skilling v. United States*, 561 U.S. 358, 130 S. Ct. 2896, 177 L. Ed. 2d 619 (2010), devised a list of seven factors that a court should analyze when determining whether to presume prejudice from publicity. This court has adopted those factors for use in this state, to-wit:

> "(1) media interference with courtroom proceedings; (2) the magnitude and tone of the coverage; (3) the size and characteristics of the community in which the crime occurred; (4) the amount of time that elapsed between the crime and the trial; (5) the jury's verdict; (6) the impact of the crime on the community; and (7) the effect, if any, of a codefendant's publicized decision to plead guilty." *Carr*, 300 Kan. at 62 (citing *Skilling,* 561 U.S. at 381-85).

*Standard of Review*

A presumed prejudice challenge is subject to a mixed standard of review. We look for substantial competent evidence in the record to support the district court's factual findings on the *Skilling* factors. Then, the overall weighing of the *Skilling* factors involves a conclusion of law subject to a de novo standard. *Carr*, 300 Kan. at 63-64.

13

*Analysis*

Miller makes no argument that the media coverage of his trial interfered with the courtroom proceedings. Accordingly, the first *Skilling* factor weighs against presumed prejudice. Cf. *State v. Longoria*, 301 Kan. 489, 507, 343 P.3d 1128 (2015).

Miller's principal focus in the district court was on the second factor—the magnitude and tone of the media coverage. He supported his venue-change motion with the testimony of Dr. Thomas Beisecker, the Chairman of the Department of Communication Studies at the University of Kansas. Dr. Beisecker opined that the publicity in 2004 and 2005, surrounding Miller's first trial, was "relatively extensive" and that the ongoing media coverage of Miller's retrial gave him "concern." He highlighted two articles that appeared in the Lawrence Journal-World in September and October of 2014, after he had conducted a venue survey.

Both the September and October online articles contained a photograph of Miller in the courtroom being "followed by an officer of the court," with the following caption: "Martin Miller is led away after being convicted of his wife's murder in Judge Paula Martin's courtroom." The print version of the October article had a headline that read: "Martin Miller Murder Retrial Put on Hold." The online version had a slightly different headline: "Once Convicted Murderer Martin Miller's Retrial Put on Hold." Dr. Beisecker testified that the headlines and the content of the articles reinforced the perception that Miller had already been convicted of killing his wife.

The reinforced perception, however, was factually accurate. Miller had previously been convicted by a jury of murdering his wife. This court has observed that "'the Sixth Amendment does not demand juror ignorance'; simply proving extensive media coverage does not establish prejudice, especially where the coverage is factual." *Longoria*, 301 Kan. at 507 (quoting *Carr*, 300 Kan. at 65).

14

To show the prejudice from the extensive media coverage, Miller offered the results of Dr. Beisecker's venue study. In that poll, 192 jury-eligible Douglas County citizens responded to questions about Miller's first trial. Of the 192 respondents surveyed, 121 or approximately 63% knew of the case. Of those 121 respondents who had knowledge of the case, 31 said Miller was "definitely guilty" and 54 said he was "probably guilty." This translated to approximately 44% of the total respondents surveyed having a preconception of Miller's guilt, or 70% of those with knowledge of the case. Dr. Beisecker opined that the 44% perceived-guilty result was "very unusual" because he would have expected knowledge of the case to have decayed over time. Dr. Beisecker noted that the expressed preconception of Miller's guilt in the jury pool at the first trial was actually less than the survey, i.e., 36% of the 48 venirepersons.

The trial court questioned whether the study provided an accurate indication of the respondents' *prior* knowledge of the case, given that the first polling question essentially related that information. Specifically, the initial questioning was as follows:

> "Next, I want to ask you about a death that occurred in Lawrence in July 2004. Mary Miller, a KU Librarian, was found dead in her bed by her husband, Marty Miller. Mr. Miller later was arrested and charged with her murder. *He was convicted by a jury of Mary Miller's murder; however, his conviction was recently overturned by the Kansas Supreme Court.* Do you recall reading, seeing, or hearing anything about Mary Miller's death, Marty Miller's trial, his conviction or his conviction's reversal?" (Emphasis added.)

The trial court pointed to *State v. Jackson*, 262 Kan. 119, 936 P.2d 761 (1997), to support its credibility concerns about the venue study in this case. In *Jackson*, the defendant conducted a survey to determine "the public's awareness of the incident [giving rise to the criminal charges] and the impact of that awareness on juror bias." 262 Kan. at 129. Initially, 10.3% of the respondents did not recall hearing or reading about the incident. But then 16.3% of that group (1.66% of the total) was able to recall the incident

15

after being asked a subsequent question that included some of the specifics of the case. The trial court observed "[t]his is an interesting statistic [in *Jackson*] since in the present case, all respondents were told facts of the case before providing any responses. The number of respondents having some independent knowledge, *i.e*., prior to being provided the facts of the case, will never be known." Accordingly, at best, the trial court assigned a neutral weight to the second *Skilling* factor.

The third *Skilling* factor—the size and characteristics of the community—is based on the common perception that the risk of impaneling a biased jury due to pretrial publicity is mitigated in larger, more diverse communities. The trial court found that this factor did not weigh in favor of a change of venue, given that the population of Douglas County was 115,000. The trial court reasoned that, even using Dr. Beisecker's percentages, the 44% of Douglas County who had formed an opinion about Miller's guilt would translate into 50,600 people, while the 37% having no knowledge of the case would total 42,550 people, from which the court could reasonably expect to impanel an impartial jury. Neither the trial court nor the parties discuss the characteristics of the community.

In *Carr,* this court applied this factor to find that Sedgwick County's population of 452,000 weighed against presumed prejudice. 300 Kan. 67-68. In contrast, in *Longoria*, we found Barton County's population of 20,546 weighed in favor of presumed prejudice when survey results indicated 97% of the county remembered the crime. 301 Kan. at 507. This case falls within those extremes.

Miller urges us to rely on *Rideau v. Louisiana*, 373 U.S. 723, 726, 83 S. Ct. 1417, 10 L. Ed. 2d 663 (1963), where the United States Supreme Court found presumed prejudice in a parish with a comparable population of 150,000 citizens. But the spectacle of a taped confession being repeatedly broadcast for three consecutive days in *Rideau* sets that case apart from this one. In *Rideau*, the effect of the magnitude and tone of the

16

pretrial publicity could not be diluted by the size of the community. Here, as the trial court aptly described, the size of the community weighs in favor of being able to impanel an unbiased jury.

The fourth *Skilling* factor focuses on the amount of time between the crime and the trial. Here, the crime occurred in July 2004; the trial court denied the motion to change venue of the retrial about 10 1/2 years later, in January 2015. Generally, courts perceive that the impact of publicity diminishes over time. See *Longoria*, 301 Kan. at 508 (lapse of 19 months marginally weighed against prejudice). But see *Carr*, 300 Kan. at 68 (lapse of 17 months inconclusive given testimony of continued relevant press coverage).

Here, Miller argues that the impact of the publicity in his case actually increased over time, as evidenced by the increase in percentage of people believing him to be guilty from 36% of the first trial jury pool to 44% of those surveyed for the retrial. It is questionable whether a direct comparison of those percentages is statistically valid. Nevertheless, under the *Skilling* factors, we are not seeking the level of actual prejudice visited upon Miller by the publicity, but rather we are considering factors to determine whether we can declare that Miller was *presumptively* prejudiced by the pretrial publicity. In that analysis, this fourth factor considers the amount of time between the crime and the retrial. That time is over 10 years. Consequently, that factor weighs against *presuming* prejudice, even if we later discern there was actual prejudice.

The fifth factor is the jury's verdict. There was nothing in the jury's verdict that would negate presumptive prejudice, such as the acquittal on some of the charges. Cf. *Skilling*, 561 U.S. at 383 (acquittal on 9 counts ran counter to presumption of prejudice). Miller points to the fact that the verdict at the second trial was the same as at the first trial, even though the evidence was significantly different. For instance, the erroneous commercial pornography evidence was not admitted at the retrial and the testimony on cause of death was different. Therefore, Miller contends that it must have been the

17

publicity that caused the jury to convict. While Miller's theory is creative, it is unpersuasive. On the question of *presumptive* prejudice, the jury verdict here was neutral.

The sixth factor looks at the impact of the crime on the community. The trial court found that "little evidence" on this factor could be gleaned from the survey results and that the defense had presented no testimony on the factor. To the contrary, Miller points out that the survey results disclosed a significant percentage of respondents had an opinion on his guilt a decade after the crime. Moreover, Dr. Beisecker testified that it was unlikely that the percentage of citizens who thought Miller was definitely or probably guilty would decrease, given that it had been 10 years since the crime. The lingering memory of the crime, together with the significant publicity it generated, both initially and prior to retrial, are evidence of a significant impact on the community. This factor would shade toward the presumption of prejudice.

The seventh factor is the effect, if any, of a codefendant's publicized decision to plead guilty. In this case, there was no codefendant, and the trial court found the factor to be inapplicable. But Miller relies on *Longoria*'s description of the factor: "The seventh and last *Skilling* factor—publicity given to a confession or other 'smoking-gun type of information'—does not apply here because Longoria did not confess and no direct evidence exists of Longoria's guilt." 301 Kan. at 508 (citing *Carr*, 300 Kan. at 69-70). *Carr*, cited by *Longoria*, spoke about "[t]he absence of publicity about smoking-gun evidence." 300 Kan. at 70. Miller argues that his conviction at the first trial is the "smoking-gun type of information" that provides direct evidence of his guilt. Moreover, he contends that the smoking-gun information was widely publicized, as evidenced by the discussions about his conviction during voir dire.

If we are to adhere to our suggestion in *Carr* and *Longoria* that the seventh *Skilling* factor includes smoking-gun evidence, one would have to include a jury conviction of the charged crime in that category. Certainly, publicity that twelve people

18

at the first jury trial looked at all of the evidence and declared, beyond a reasonable doubt, that Miller killed his wife would be as compelling as a news account that Miller was found in possession of a smoking gun. On the other hand, *Skilling* focused on the unique character of a confession in discussing this factor, opining that "'[a] jury may have difficulty in disbelieving or forgetting a defendant's opinion of his own guilt but have no difficulty in rejecting the opinions of others because they may not be well-founded.'" 561 U.S. at 383.

But even giving Miller the benefit of any doubt about the applicability of the seventh factor, he is not entitled to reversal of his conviction under the extremely high standard this court has set for presumed prejudice claims. In *Carr*, where a venue study revealed that 96% of those surveyed were aware of the case, nearly three-fourths thought the defendant was either definitely guilty or probably guilty, and 72.3% of those surveyed thought the evidence of guilt was overwhelming or strong, we affirmed the district court's denial of a motion to change venue. In doing so, we stated that "[r]eversal of a conviction will occur only 'where publicity "created either a circus atmosphere in the court room or a lynch mob mentality such that it would be impossible to receive a fair trial."'" 300 Kan. at 62. We even considered whether the press was "running amok in the courtroom." 300 Kan. at 74. In *Longoria*, we reiterated that a defendant can obtain a change of venue "only upon showing that publicity has displaced the judicial process entirely or that the courtroom proceedings more resemble a circus or a lynch mob." 301 Kan. at 506. Indeed, our published caselaw is devoid of even a single case in which the Kansas Supreme Court has reversed a trial court's refusal to change venue based on publicity. Simply put, then, Miller has not presented a circumstance that is any more compelling than previous cases in which we have rejected a presumptive prejudice claim, and he must suffer the same fate.

*Actual Prejudice*

Actual prejudice is where jury selection reveals that the impact of pretrial publicity is so substantial as to taint the entire jury pool. *Robinson*, 303 Kan. at 60. In other words, "'the voir dire testimony and the record of publicity [must] reveal the kind of wave of public passion that would have made a fair trial unlikely by the jury that was impaneled as a whole.' [Citations omitted.]" *Roeder*, 300 Kan. at 909.

> "'In reviewing for actual prejudice, we examine . . . "whether the judge had a reasonable basis for concluding that the jurors selected could be impartial."' *McVeigh,* 153 F.3d 1166, 1183 (10th Cir. 1998) (quoting *United States v. Abello-Silva,* 948 F.2d 1168, 1177-78) (10th Cir. 1991). The crucible for determination of actual prejudice is voir dire. *Foley v. Parker,* 488 F.3d 377, 387 (6th Cir. 2007). 'The court must review the media coverage and the substance of the jurors' statements at voir dire to determine whether a community-wide sentiment exists against the defendant.' 488 F.3d at 387."
> *Carr*, 300 Kan. at 74-75.

*Standard of Review/Tests*

In *Carr*, we discussed the appellate review for actual prejudice as follows:

> "The appellate standard of review of a district judge's decision on actual prejudice is abuse of discretion. Jury selection is a task 'particularly within the province of the trial judge.' *Ristaino v. Ross,* 424 U.S. 589, 594-595, 96 S. Ct. 1017, 47 L. Ed. 2d 258 (1976). Thus, when a district judge rules that a juror can set aside pretrial publicity and decide the case on the evidence, his or her ruling is entitled to special deference:
>
> > "'Appellate courts making after-the-fact assessments of the media's impact on jurors should be mindful that their judgments lack the on-the-spot comprehension of the situation possessed by trial judges.

20

"'Reviewing courts are properly resistant to second-guessing the trial judge's estimation of a juror's impartiality, for that judge's appraisal is ordinarily influenced by a host of factors impossible to capture fully in the record—among them, the prospective juror's inflection, sincerity, demeanor, candor, body language, and apprehension of duty. [Citation omitted.] In contrast to the cold transcript received by the appellate court, the in-the-moment voir dire affords the trial court a more intimate and immediate basis for assessing a venire member's fitness for jury service. We consider the adequacy of jury selection . . . therefore, attentive to the respect due to district-court determinations of juror impartiality and of the measures necessary to ensure that impartiality.' *Skilling,* 561 U.S. at 386-87." 300 Kan. at 75.

*Analysis*

Similar to the presumed prejudice analysis, the determination of actual prejudice involves the consideration of factors. For actual prejudice, this court has employed nine factors, to-wit:

"(1) the degree of publicity circulated through the community; (2) the degree the publicity circulated through areas to which venue could be changed; (3) the length of time from the dissemination of the publicity to the trial date; (4) the care exercised and ease encountered in jury selection; (5) the familiarity with publicity and its resultant effects upon prospective jurors or trial jurors; (6) challenges exercised by the defendant in jury selection, both peremptory and for cause; (7) the connection of government officials with the release of the publicity; (8) the severity of the offense charged; and (9) the particular size of the area from which the prospective jurors are drawn." *Hudgins,* 301 Kan. at 642.

Miller asserts that the second and seventh *Hudgins* factors are not relevant to his claim of actual prejudice. He also does not address the eighth factor. Miller combines his arguments on the remaining factors, making two general contentions.

21

First, Miller argues that Dr. Beisecker's testimony as to the "relatively extensive" publicity during and following his first trial and conviction, as well as prior to retrial, weighed in favor of actual prejudice. The State does not refute that the degree of publicity circulating through the community would meet the first *Hudgins* factor. Rather, it takes the tack that "'media publicity alone *never* establishes prejudice.'" *Roeder*, 300 Kan. at 911 (quoting *State v. Verge*, 272 Kan. 501, 508, 34 P.3d 449 [2001]); see also *Carr*, 300 Kan. at 75 ("'Negative media coverage by itself is insufficient to establish actual prejudice.'").

Next, Miller contends that he faced undue difficulty in impaneling the jury. He points to the fact that the parties examined 80 prospective jurors over a two-day period, and that the defense challenged for cause 28 of those prospects. The basis for those challenges was either a knowledge of Miller's prior conviction or an expressed opinion that Miller was guilty. Miller suggests that his challenges for cause revealed both the prospective jurors' familiarity with the publicity and its effect on their opinion as to his guilt.

But this court has clarified that it is not enough for a defendant to show that jurors knew about the case beforehand or even that their prior knowledge incubated an opinion that defendant was guilty. *Carr* described what is required:

> "And the fact that jurors entered the box with preconceived opinions of guilt alone does
> not overcome a presumption of juror impartiality. 'It is sufficient if the juror can lay aside
> his impression or opinion and render a verdict based on the evidence presented in court.'
> *Irvin v. Dowd,* 366 U.S. 717, 722-23, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961). 'The
> relevant question is not whether the community remembered the case, but whether the
> jurors at . . . trial had such fixed opinions that they could not judge impartially the guilt of
> the defendant.' *Patton v. Yount,* 467 U.S. 1025, 1035, 104 S. Ct. 2885, 81 L. Ed. 2d 847

22

(1984); *Goss v. Nelson,* 439 F.3d 621, 627 (10th Cir. 2006) (defendant's right to impartial tribunal satisfied when jurors can base decision on evidence)." 300 Kan. at 75-76.

As Miller acknowledges, the trial court granted only 18 of his challenges for cause, apparently finding that the other 10 challenged prospective jurors could set aside any prior knowledge or opinions and decide the case on the evidence. Moreover, a jury panel that was passed for cause was obtained in two days from an examination of 80 persons. By comparison, in *Carr*, 86 persons were examined to obtain a passed-for-cause jury panel and the selection process took 19 days. In the context of a retrial of a high-profile murder case, the facts do not suggest an inordinate difficulty in selecting a jury.

Miller argues, however, that he was required to employ his peremptory challenges to remove 9 of the 10 challenged venirepersons that the trial court passed for cause. Further, he claims that he was unable to strike one of the challenged persons because he had exhausted all of his peremptory strikes. Consequently, Miller argues, a biased juror sat on the jury that convicted him upon retrial, which he labels as a "key factor weigh[ing] in favor of establishing actual prejudice."

The question of whether the district court impaneled a biased juror will be the subject of the next issue we consider. But *Hudgins* does instruct us to consider the challenges exercised by the defendant during jury selection, "both peremptory and for cause." 301 Kan. at 642. According to Miller's argument, he exercised 27 challenges during jury selection—18 for cause and 9 peremptory—specifically to counter the effects of the extensive pretrial publicity. Those numbers certainly point toward a prejudicial effect from the pretrial publicity.

But again, looking at our decision in *Carr* undermines the efficacy of Miller's argument. There, 4 of the final 12 jurors "had admitted during individual voir dire that they believed the defendants were guilty based on pretrial publicity." 300 Kan. at 53.

23

Employing Miller's argument in this case would have meant that 1/3 of the *Carr* jury—not just one juror—was biased by publicity, thus establishing actual prejudice. But *Carr* did not discern actual prejudice from the publicity in that case. First, the *Carr* majority gave deference to the trial court's reliance "on the prospective jurors' statements that they could set their opinions aside and decide the case impartially on the evidence presented." 300 Kan. at 53, 78. Then, it was reassured by the protective measures taken by the trial judge, "including use of jury questionnaires and individual voir dire." 300 Kan. at 79.

Similarly, here, the 10 jurors passed for cause by the trial court each said that he or she could serve as an impartial juror. Moreover, the record indicates that the trial judge exercised care in the jury selection, including granting the defense motion for individual voir dire and having the prospective jurors complete an extensive questionnaire. See *Hudgins*, 301 Kan. at 643 ("[T]he district court's use of an extensive questionnaire to assist with jury selection demonstrates exceptional care in the process."). In sum, Miller has failed to demonstrate that actual prejudice from pretrial publicity mandates a reversal of his conviction.

TRIAL COURT'S DENIAL OF FOR-CAUSE JUROR CHALLENGES

Miller complains that the trial court erroneously denied his for-cause challenges to 10 prospective jurors who had knowledge of Miller's prior conviction and/or a preconceived opinion that he was guilty. As a consequence of that error, Miller asserts, he was forced to "exhaust" his peremptory strikes to remove nine of those challenged jurors, which denied him the statutory right to exercise 12 peremptory strikes of qualified jurors. Moreover, because Miller had exhausted all of his peremptory challenges, one of the challenged jurors, A.S., was left on the jury, which denied Miller his constitutional right to a fair and impartial jury.

*Standard of Review*

Appellate courts have traditionally accorded a great deal of deference to a trial court's ruling on a juror challenge for cause. That deference is based upon the concept that the trial judge's first-hand view of a prospective juror's demeanor puts the judge in a better position to assess that person's impartiality. Consequently, this court has refused to overrule a trial court's denial of a defendant's jury challenge for cause unless the defendant can establish that the ruling is clearly erroneous or amounts to an abuse of discretion. *State v. Cheever*, 306 Kan. 760, 787, 402 P.3d 1126 (2017) (citing *State v. Ackward*, 281 Kan. 2, 27, 128 P.3d 382 [2006]). Judicial action constitutes an abuse of discretion if the action: (1) is arbitrary, fanciful, or unreasonable; (2) is based on an error of law; or (3) is based on an error of fact. See *State v. Mosher*, 299 Kan. 1, 3, 319 P.3d 1253 (2014).

Miller bears the burden of establishing that the trial court's denial of a for-cause juror challenge was an abuse of discretion. *State v. Ransom*, 289 Kan. 373, 389, 212 P.3d 203 (2009). Moreover, the failure to excuse a juror for cause does not constitute a ground for reversal of a conviction unless the defendant can show that he or she was prejudiced as a result. *State v. Heath*, 264 Kan. 557, 587, 957 P.2d 449 (1998).

*Analysis*

We begin with Miller's constitutional claim. The Sixth Amendment and Section 10 of the Kansas Bill of Rights guarantee an accused the right to a fair and impartial jury. *Carr*, 300 Kan. at 56. The purpose of voir dire is to enable the parties to select jurors who are competent and without bias, prejudice, or partiality. *State v. Woods*, 301 Kan. 852, 870, 348 P.3d 583 (2015) (quoting *State v. Reyna*, 290 Kan. 666, 686, 234 P.3d 761 [2010]). Peremptory challenges are one of the means to achieve an impartial jury. *State v. McCullough*, 293 Kan. 970, 996, 270 P.3d 1142 (2012); *Heath*, 264 Kan. at 588. The

right to peremptory challenges is statutory, not constitutional. *State v. Manning*, 270 Kan. 674, 692, 19 P.3d 84 (2001) (citing *Ross v. Oklahoma*, 487 U.S. 81, 88, 108 S. Ct. 2273, 101 L. Ed. 2d 80 [1988]), *disapproved of on other grounds by State v. King*, 288 Kan. 333, 204 P.3d 585 (2009).

Although a defendant may be forced to use his or her peremptory challenges to correct erroneous for-cause rulings, "the issue is a nonissue on appeal if there is no showing of prejudice surrounding the sitting jury." *Manning*, 270 Kan. at 694; see *McCullough*, 293 Kan. at 996 ("Prejudice cannot be established through the loss of a peremptory challenge alone."); *Ackward*, 281 Kan. at 28-29 (the loss of a peremptory challenge in and of itself does not constitute a violation of the Sixth Amendment right to an impartial jury). In other words, the question before the appellate court is "whether the jury *that heard* the case was impartial." (Emphasis added.) *Ackward*, 281 Kan. at 28 (citing *Heath*, 264 Kan. at 587-88).

Consequently, Miller's constitutional claim requires him to show that the jury, with A.S. impaneled, was not fair and impartial. His first tack is to rely on an old Kansas case, *The State v. Burton*, 65 Kan. 704, 707-08, 70 P. 640 (1902), as well as authority from other jurisdictions, to argue that a juror's knowledge that the defendant had been previously convicted of the same murder is enough, standing alone, to vitiate the second verdict and require yet another new trial. But subsequent Kansas law refutes that notion.

The trial court cited to *The State v. Farrar*, 103 Kan. 774, 176 P. 987 (1918), and *State v. Cook*, 281 Kan. 961, 135 P.3d 1147 (2006), as the controlling law in this state. *Farrar* rejected the argument that a juror's knowledge that the defendant had been convicted for the same crime in an earlier trial is inherently prejudicial, declaring that such knowledge "does not naturally or necessarily tend to corrupt the deliberations of a jury, presumably regardful of their oaths and the instructions given by the court." 103 Kan. at 777. Nearly nine decades later, *Cook* declared that the "*Farrar* principle"—

26

that a juror's knowledge of a previous conviction for the same crime is not inherently prejudicial—is still good law. See 281 Kan. at 978, 981-82. Consequently, the challenged venirepersons who had knowledge of Miller's prior conviction were not automatically disqualified and Miller has to show more than their prior knowledge to establish that the district court erred in refusing to strike them for cause.

Miller claims that several of the ten challenged venirepersons acknowledged that his prior conviction would affect their ability to judge this case in an impartial manner. He briefly mentions E.M., C.M., and C.S. before discussing in detail why he believes A.S. could not have been fair and impartial. Miller points to the following colloquy during voir dire, adding his emphases:

> "MR. NEY [defense counsel]:  Okay. Well, does it—I mean, is that something that's gonna be in your mind as you make a decision in this case, 'Hey, he was convicted?'
>
> "[A.S.]:  That he was convicted before?
>
> "MR. NEY:  Yeah.
>
> "[A.S.]:  No, because I didn't know all the facts. I mean, like I said, I only knew what I read.
>
> "MR. NEY:  Uh-huh. Right.
>
> "[A.S.]:  You put different facts in front of me, *it could change my mind all about it.* I mean, I didn't know back then what I could know now.
>
> "MR. NEY:  All right. And you say change your mind. I mean, your mind right now is where?
>
> "[A.S.]:  *Well, if he was already convicted, that's where my mind is right now.*

27

. . . .

"MR. NEY: And maybe I just need a little more explanation. When you said that's where my mind is right now, you believe what about Mr. Miller as he sits here today?

"[A.S.]: I don't know how to say this. . . .

. . . .

"MR. NEY: . . . Let me ask it a different way maybe. Back in 19— I'm sorry, back in 2005, you knew he went to jail, that he was convicted.

"[A.S.]: Uh-huh.

"MR. NEY: Right?

"[A.S.]: Yes.

"MR. NEY: Okay. And you said you know, from what you remember, sounded like he killed her.

"[A.S.]: Yes.

"MR. NEY: Right? Okay. Has that changed? *Is that what you're talking about changing? Is that still your belief?*

"[A.S.]: *I guess so, yes,* because . . .

. . . .

"[A.S.]: I mean, because if that's what he was convicted of, that's what I have to believe pretty much, because I don't know any different.

28

"MR. NEY:  Okay. That's—okay. And while you're willing to listen, *it would take something to change your mind about that?*

"[A.S.]: *Yes.*

"MR. NEY:  Okay. Well, Mr. Bauch asked you could you set aside what you had heard before, start with a clean slate. Is that true or not? Can you?

"[A.S.]: It's—that's something I would have to be put in the position of. *I couldn't say— just say, yes, I could clear my mind.* I would have to hear the facts that I didn't know back then and make my decision from there. But I didn't—*I can't say that I can just clear my mind of that.*" (Emphases added.)

When asked by defense counsel if the knowledge of Miller's previous conviction would affect his deliberations in the current trial, A.S. responded that "it would always be in the back of [his] head" and that he could not "push that away." A.S. responded similarly when asked by the trial judge whether he would be thinking about what the other jury did in the previous trial, to-wit:  "Like I said, it will be in the back of my head. That's not something I can just block out." The trial judge stated that she recognized that it is "hard to say what you can and can't set aside," but inquired further, "[I]f you're selected . . . can you listen to the evidence as presented in court and base your decision just on that, or will you always be thinking about what another jury did?" A.S. replied, "I think I could."

The trial judge followed up by asking, "[A]re you going to make Mr. Miller prove he's not guilty, or are you going to hold the State to its burden and make them prove he is?" A.S. replied, "I think I could set aside the past, and if I heard the facts, and make my decision off of that." The trial judge clarified, "Off of only what you hear in the courtroom?" A.S. replied in the affirmative. A.S. again replied in the affirmative when asked the same question again.

29

The trial judge then denied the defense challenge for cause, first observing that we all know that "no one can put things out of their head completely." But the trial judge interpreted A.S.'s voir dire responses as establishing that "when [A.S.] was asked if he could decide this case based solely on what he heard in the courtroom and not consider any other facts from other sources, he said he could."

Citing to the old case of *The State v. Miller*, 29 Kan. 43, 48 (1882), Miller argues that when a juror admits that his or her opinion of the defendant's guilt would remain until removed by evidence to the contrary, that juror is incompetent to serve in the case and the trial court errs in overruling a defense challenge to the juror for cause. He also points to the slightly newer case of *The State v. Beatty*, 45 Kan. 492, 25 P. 899 (1891), for the proposition that the juror's stated belief in his or her own impartiality does not cure the incompetence. Specifically, he quotes from *Beatty*, "[I]f a juror have [*sic*] an opinion as to the guilt or innocence of the accused, even if based solely upon newspaper reports, so fixed as to require evidence to remove it, he is not competent, although he may believe that he can render an impartial verdict on the evidence." 45 Kan. at 500.

Much more recently, this court explained that the presumption of innocence, although not explicitly stated in the United States Constitution, is a basic component of our criminal justice system that is founded on the principle that a criminal accused is entitled to have his or her guilt or innocence determined solely on the basis of trial evidence and not upon "'grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial.'" *State v. Ward*, 292 Kan. 541, 570-71, 256 P.3d 801 (2011) (quoting *Taylor v. Kentucky,* 436 U.S. 478, 485, 98 S. Ct. 1930, 56 L. Ed. 2d 468 [1978], and *Estelle v. Williams,* 425 U.S. 501, 503, 96 S. Ct. 1691, 48 L. Ed. 2d 126 [1976]).

A fair reading of A.S.'s voir dire responses indicates that he knew that Miller had been previously convicted of murdering his wife; that his prior knowledge of the case had

led him to believe Miller had killed his wife; that the fact of the prior conviction would always be in the back of his mind; and that if different evidence were to be presented at this trial, he could change his mind about Miller's guilt. Upon being asked by the court whether he could base his decision solely on the evidence presented in court, A.S. initially responded equivocally, "I think I could." As noted, though, further questions by the court elicited an affirmative response, again initially prefaced by "I think I could," that the trial court interpreted as meaning that A.S. could "decide this case based solely on what he heard in the courtroom." One could certainly question whether the trial court's determination of A.S.'s testimony was supported by the facts in evidence. Nevertheless, even after the questioning, when it announced its denial of the defense challenge to A.S., the trial court acknowledged that "no one can put things out of their head completely." In context, that statement suggests that the trial court founded its for-cause denial on a belief that the requisite presumption of innocence starting point could coexist with a back-of-the-mind belief in the defendant's guilt. Nevertheless, the result in this case will not be affected if we simply assume, without deciding, that the trial court erred in denying Miller's for-cause challenge to A.S.

Notwithstanding an erroneous denial of a defense for-cause challenge to a prospective juror, this court has historically declined to reverse the conviction on that basis when the defense had the opportunity to cure the error with a peremptory challenge. See *State v. Mayberry*, 248 Kan. 369, 382, 807 P.2d 86 (1991) (defendant has no grounds for complaint about trial court's failure to strike jurors for cause when defendant could have, but failed to, cure any error with a peremptory challenge), *disapproved on other grounds by State v. Gunby*, 282 Kan. 39, 144 P.3d 647 (2006); *State v. Dixon*, 248 Kan. 776, 790-91, 811 P.2d 1153 (1991) (no reversible error in trial court refusal to strike juror for cause when record does not indicate why defendant failed to utilize peremptory challenge to strike that juror).

31

Granted, in both *Mayberry* and *Dixon*, this court noted that the defendant had not made an argument that using a peremptory challenge on the juror challenged for cause would have made the defendant accept other objectionable jurors. Here, Miller repeatedly asserts that he could not use a peremptory strike on A.S. because he had exhausted all of his peremptory challenges. But the numbers are off. Miller had 12 peremptory challenges and used 9 to strike the other venirepersons he had challenged for cause. That leaves three discretionary challenges. At one point, he argues that, by using the nine peremptory challenges on the venirepersons who should have been stricken for cause, he was forced to accept two nurses and a correctional officer on the jury. But that leaves unexplained how Miller used the three remaining peremptory challenges and why one could not have been used to cure the district court's error. In sum, Miller has failed to show the requisite prejudice to warrant a reversal on his constitutional claim.

For his statutory claim, Miller reasserts that he did not pass the jury for cause because 10 jurors had knowledge of his previous conviction and/or had an opinion of his guilt; that after exhausting all of his peremptory strikes, A.S., an objectionable juror, remained on the jury; and that Miller was forced to accept two nurses and a correctional officer on the jury that would have been peremptorily struck if he had not been deprived of his full statutory right to 12 peremptory challenges. He urges us to change our current law, so that it is unnecessary for a defendant to show actual bias to remedy a statutory violation. But our law is to the contrary:

> "The failure to excuse a juror for cause does not constitute a ground for reversal unless the defendant was prejudiced. *Crawford,* 255 Kan. at 51. We have consistently held that a trial court's discretion on removing a juror for cause is not an issue and that there is no reversible error where a trial court refuses to excuse a juror for cause and one of the parties subsequently removes the juror using one of their peremptory challenges. See *Heath,* 264 Kan. at 588 (holding that there was no reversible error where trial court refused to remove jurors for cause as defendant subsequently removed the jurors using peremptory challenges); *Crawford,* 255 Kan. at 52-53 (holding that there was no

32

reversible error where defendant had to use one of his peremptory challenges to remove a prospective juror whom the trial court had refused to remove for cause); *State v. Dixon,* 248 Kan. 776, 788-89, 811 P.2d 1153 (1991) (holding that there were no grounds for reversal on trial court's failure to remove juror for cause as defendant removed same juror using peremptory challenge)." *Manning*, 270 Kan. at 692-93.

All agree that Miller was statutorily entitled to exercise 12 peremptory challenges. He was accorded the opportunity to make those 12 peremptory strikes; he got what the law provided and he is not entitled to another opportunity to choose his peremptory strikes.

## DENIAL OF BIFURCATION REQUEST

Miller requested that the trial court bifurcate his trial into two phases. In the first phase, the jury would determine whether the State had proved, beyond a reasonable doubt, that Mary's death was a homicide. Then, if so, during a second trial, the same jury would determine the degree of homicide that had been committed. In effect, Miller asked for separate trials on different elements of the same, singular crime. The trial court denied the motion, stating that the State has the right to present its case as it sees fit, including a full presentation in which everything is put into context, rather than a piecemeal presentation.

Miller argues that bifurcation was constitutionally required because he could not get the fair and impartial trial guaranteed by the Sixth Amendment if the jury were to be prejudicially influenced by the motive evidence, e.g., his extramarital affair, when determining whether Mary was, in fact, killed. He claimed that K.S.A. 2017 Supp. 60-242(b) provided the procedural mechanism to effect the bifurcation. That statute authorizes a district court in *civil proceedings* to "order a separate trial . . . of one or more separate issues" to avoid prejudice to a party.

33

*Standard of Review*

The parties disagree as to the applicable standard of review. Miller, relying on *State v. White*, 279 Kan. 326, 332, 109 P.3d 1199 (2005), contends that because his motion to bifurcate is an evidentiary-based question that implicates the Sixth Amendment right to a fair trial, this court's review is de novo. The State, however, counters that since Miller predicated his motion to bifurcate on K.S.A. 2017 Supp. 60-242(b), the proper inquiry is whether the trial court abused its discretion in refusing to bifurcate the proceeding. Cf. *Guy Pine, Inc. v. Chrysler Motors Corp.*, 201 Kan. 371, 373, 440 P.2d 595 (1968) (motion asking for bifurcation under K.S.A. 60-242[b] [Corrick] rests largely in discretion of trial court).

The State has the better argument. By using K.S.A. 2017 Supp. 60-242(b) as the vehicle to bifurcate, Miller invoked the discretion of the court. His attempt to spin the claim as an evidentiary constitutional problem is unavailing. Of course, if the trial court's denial was based on an error of law, that would constitute an abuse of discretion. *Mosher*, 299 Kan. at 3 (judicial action an abuse of discretion if it is arbitrary, fanciful, or unreasonable; is based on error of law; or is based on error of fact).

*Analysis*

As noted, K.S.A. 60-242(b) is part of the Kansas Code of Civil Procedure, K.S.A. 60-101 et seq., and no counterpart is contained in the Kansas Code of Criminal Procedure, K.S.A. 22-2101 et seq. Miller points out that we have held that provisions of the Civil Code may be applicable to criminal proceedings when there is no contrary provision in the Criminal Code. See *State v. Harris*, 259 Kan. 689, 709, 915 P.2d 758 (1996) (applying filing provisions of K.S.A. 60-205[e] to criminal case); see also *State v. Edwards*, 299 Kan. 1008, 1016-17, 327 P.3d 469 (2014) (applying rationale in *Harris* to conclude that civil discovery rules relating to notice for parties introducing testimony of

expert witnesses found in K.S.A. 2013 Supp. 60-226 did not govern criminal proceedings given the comparable counterpart in K.S.A. 2013 Supp. 22-3212); *State v. Campbell*, No. 100,660, 2010 WL 198502, at *4 (Kan. App. 2010) (unpublished opinion) (applying pleading requirements in K.S.A 60-207(b)(1) to criminal defendant's motion to modify sentence).

But there are fundamental differences between civil trials and criminal trials that counsel against having separate trials on each element of a single crime. For instance, sometimes it is important to parse a civil jury's verdict by having it answer a special question. But a criminal "jury is vested with the duty to determine whether a defendant is guilty or not guilty of each charged crime." *State v. Brown*, 298 Kan. 1040, 1045, 318 P.3d 1005 (2014). "In general the only proper verdicts to be submitted in a criminal prosecution are 'guilty' or 'not guilty' of the charges." *State v. Osburn*, 211 Kan. 248, 256, 505 P.2d 742 (1973). Accordingly, in the guilt phase of a criminal trial, "use of special questions is prohibited." *Brown*, 298 Kan. at 1046.

The reason Miller wanted separate trials was to compartmentalize the evidence by element, in order to avoid the possibility that evidence presented on one element might influence the jury's decision on another element. But the jury's decision on any one element is of no consequence. It must declare the defendant guilty or not guilty by "apply[ing] the law to the facts as it finds them." 298 Kan. at 1045. And the jury must apply the law, including all of the elements of the crime, to all of the facts in the case. Consequently, the district court did not err in refusing to bifurcate the trial by separate elements.

DENIAL OF COMPLETE REQUESTED LIMITING INSTRUCTION

After the district court denied Miller's request for bifurcation, he proposed the following limiting instruction:

35

"Evidence has been admitted tending to prove that the defendant had a sexual affair and accessed dating sites. This evidence may be considered solely for the purpose of proving the defendant's motive and intent.

"Evidence the Defendant had an affair or accessed dating sites may not be used by you as any proof that the death of Mary Miller was a homicide."

The trial court gave a limiting instruction, but modified the first sentence of Miller's proposed instruction and entirely eliminated the last sentence.

*Standard of Review*

For challenges to jury instructions, the progression of analysis and corresponding standards of review on appeal are:

"'"(1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in [*Ward*, 292 Kan. 541].'" [Citation omitted.]" *State v. Fisher*, 304 Kan. 242, 256-57, 373 P.3d 781 (2016).

*Analysis*

Miller makes the conclusory claim that, by eliminating the last sentence of his proposed instruction, the jury was permitted to convict him based on prior bad act

36

evidence. But the jury was specifically instructed that its use of that evidence was restricted to determining motive and intent.

Moreover, Miller fails to show the legal appropriateness of his proposed instruction precluding the jury from considering Miller's affair as evidence that Mary's death was a homicide. One could certainly perceive that a husband's motive to kill his wife might be material and probative to the question of whether the wife's death under suspicious circumstances was a homicide, rather than a natural death. See *State v. Vasquez*, 287 Kan. 40, 52, 194 P.3d 563 (2008) ("Although motive is not an element of premeditated first-degree murder, evidence of its existence can be highly persuasive circumstantial evidence of guilt. It is the 'moving power that impels one to action for a definite result.' [Citation omitted.]"). Consequently, Miller fails to show that the district court's modified instruction was erroneous.

DISQUALIFICATION OF THE DISTRICT ATTORNEY'S OFFICE

Miller moved to disqualify the Douglas County District Attorney's Office based upon a conflict of interest with a witness in this case and because the office came into possession of information protected by the attorney-client privilege. The district court denied the motion.

*Standard of Review*

A district court's decision on a motion to disqualify an attorney is reviewed for an abuse of discretion. See *State v. McKibben*, 239 Kan. 574, 582, 722 P.2d 518 (1986); *State v. Cope*, 30 Kan. App. 2d 893, 895, 50 P.3d 513 (2002). Discretion is abused if a court bases its decision on a mistake of fact or a mistake of law or if no reasonable person would take the court's position. *State v. Marshall*, 303 Kan. 438, 445, 362 P.3d 587 (2015); *In re M.F.*, 290 Kan. 142, 150, 225 P.3d 1177 (2010) ("[T]o properly exercise

37

discretion, a district court must apply the correct legal standard, and the determination of that standard is a question of law subject to de novo review.").

*Conflict of Interest*

*Additional Facts*

The alleged conflict arose in July 2014 when an Assistant District Attorney (ADA) in the Douglas County prosecutor's office, Evelyn Kemple, allowed the defendant's son, Matthew, to reside in the ADA's home, rent-free. Matthew was in his early 20s at the time and was a friend of Kemple's son, who invited Matthew into the Kemple household on an interim basis when the young men's plans to rent an apartment together fell through. The ADA and Matthew discussed the arrangements in advance: Matthew would provide his own food, but pay no rent.

At the time, the ADA knew that Matthew was a witness in a pending murder case her office was prosecuting, but she was not involved in that case. In turn, Matthew knew the ADA worked for the office prosecuting his father's case. The ADA informed the District Attorney, Charles Branson (DA), of the living arrangement. The DA did not think any ethical violations were being committed, but was concerned that the DA's office might be disqualified from prosecuting the case. The DA instructed the ADA not to discuss the case with Matthew or to discuss the case with anyone in the DA's office.

At a hearing on the disqualification motion, the ADA and Matthew provided similar testimony about the occasions when the pending case was mentioned in each other's presence. First, at their initial meeting, the ADA expressed sympathy regarding the situation. Next, when Matthew was upset that his mental health records had been subpoenaed, the ADA commented that she thought that was "unnecessary," albeit she offered no advice. Another time, Matthew mentioned in passing that he had "looked over

38

stuff about the case," but the ADA did not know what that entailed. Finally, Matthew said that he had briefly discussed his recollections regarding the night his mother died during a conversation with the ADA's daughter, during which the ADA was present but not participating in the conversation. Although the ADA did not recall Matthew's conversation with her daughter, she acknowledged that at some point she overheard Matthew discussing the fact that he was going to testify at the retrial and that he had friends who were going to bring him games to play while he was in the witness room.

The district court denied Miller's motion to disqualify the DA's office in a memorandum order. While the court opined that the ADA's decision appeared to be "so improper and unseemly," it was not cause for disqualification of the entire office. Specifically, the district court held that there was no conflict of interest; that the rent-free living arrangement did not constitute financial assistance in connection with pending litigation; and that Matthew's testimony was not at risk of being influenced by the DA's office. The court opined that Branson's directives to his ADA to not discuss the case with Matthew or with her coworkers were sufficient to protect Miller's right to a fair trial. Nevertheless, the district court specifically ordered that the ADA was disqualified from the case and further ordered her not to communicate with any witness, especially Matthew, about the case.

*Analysis*

Miller argues that Matthew's living arrangement created a conflict of interest that should have been imputed to the entire DA's office. He further argues that, by allowing Matthew to have rent-free accommodations, the ADA unlawfully compensated a witness. Both arguments are unavailing.

First, we clarify the question that is before us. We are not determining whether the ADA violated our Kansas Rules of Professional Conduct (KRPC). That ethical analysis is

separate from the legal question of whether the trial court abused its discretion by refusing to disqualify the DA's office in this criminal proceeding. Indeed, the introduction to the KRPC explicitly clarifies the distinction:

> "Violation of a Rule should not itself give rise to a cause of action against a lawyer nor should it create any presumption in such a case that a legal duty has been breached. In addition, violation of a Rule does not necessarily warrant any other nondisciplinary remedy, such as disqualification of a lawyer in pending litigation." Supreme Court Rule 226, Scope [20] (2018 Kan. S. Ct. R. 285).

Our caselaw also draws the distinction. See, e.g., *State v. Gonzalez*, 290 Kan. 747, 758, 234 P.3d 1 (2010) (discussing distinction between privilege law and attorney ethics); *OMI Holdings, Inc. v. Howell*, 260 Kan. 305, 325, 918 P.2d 1274 (1996).

Likewise, we are not tasked with determining whether the ADA violated the American Bar Association (ABA) Criminal Justice Standards. Miller cites to these standards to support his argument, but the standards make clear that they are aspirational and "are not intended to serve as the basis for the imposition of professional discipline, to create substantive or procedural rights for accused or convicted persons . . . or to serve as a predicate for a motion to suppress evidence or dismiss a charge." ABA Criminal Justice Standards for the Prosecution Function, 3-1.1 (2015).

Nevertheless, the rules and accompanying comments in the KRPC can provide persuasive guidance in determining the legal issues. Here, the determinative issue is whether the district court abused its discretion by not finding that any conflict of interest the ADA created for herself by allowing Matthew to live in her home had to be imputed to the entire DA's office. KRPC 1.10 (2018 Kan. S. Ct. R. 318) addresses the imputation of one attorney's conflict to the entire firm in which that attorney practices, and we have held that a prosecutor's office is to be treated like a law firm. *State v. Dimaplas*, 267 Kan. 65, 70, 978 P.2d 891 (1999). But KRPC 1.10(a) contains an exception, to-wit: "unless

40

the prohibition is based on a personal interest of the prohibited lawyer and does not present a significant risk of materially limiting the representation of the client by the remaining lawyers in the firm." (2018 Kan. S. Ct. R. 318.). Comment [3] to KRPC 1.10(a) instructs that conflicts are not imputed when there is no question of client loyalty or protection of confidential information.

As noted, the district court held that there was no conflict of interest in this case. But the district court disqualified the ADA from personally participating in the case, at least suggesting some level of impropriety. But the district court also found that the safeguards put in place by the DA were sufficient to assure that Miller was not prejudiced by the ADA's living arrangements with a State's witness. We agree. The posture of the case was that a retrial was pending, meaning that Matthew had already provided his testimony at the earlier trial. The likelihood that the nonparticipating ADA could influence Matthew's testimony at retrial to the detriment of Miller was remote, if not nonexistent. And the ADA's isolation from the actual prosecution team further assured that any conflict of the ADA need not be imputed to the DA's office.

In short, the district court did not abuse its discretion in refusing to disqualify the DA's office based on a conflict of interest.

Similarly, Miller's contention that the rent-free arrangement was tantamount to providing a witness with a financial incentive is creative, but unpersuasive. He cites to the ABA Criminal Justice Standards for prosecutors as authority for prohibiting a prosecutor from providing a witness living expenses in return for his or her testimony. But as pointed out above, even if Miller can establish that the ADA violated this aspirational standard, such a violation does not translate into a district court's abuse of discretion for failing to disqualify the DA's office.

41

In the district court, Miller relied upon Model Rule of Professional Conduct 1.8(e). In Kansas, the corresponding identical rule is KRPC 1.8(e) (2018 Kan. S. Ct. R. 309), which only prohibits providing financial assistance to clients, and Matthew was not the DA's client. Further, the living arrangements in this case came about because of Matthew's friendship with the ADA's son. The arrangement did not induce Matthew's testimony at the retrial, nor is there any indication that it had the capacity to influence the substance or truthfulness of his testimony. Again, the district court did not abuse its discretion.

*Privileged Information*

*Additional Facts*

In 2004, someone found a day planner in an airport parking lot and turned it over to the police. The planner belonged to a private investigator, James Hayes, and contained notes of a meeting between Miller and Kevin Regan, an attorney Miller had consulted regarding his defense.

The police reviewed the contents of the planner, placed it in an evidence locker, and notified the DA's office. An ADA told police to copy the planner and place it into evidence. Pointedly, no one notified the defense or the district court, and no attempt was made to return the property to its rightful owner.

The notes in the planner detail Miller's version of events the night Mary died. That description of events matches testimony at the first trial regarding Miller's statements to Officer Welsh the morning Mary's body was discovered and his statements to Detective Cross later that morning. The actual planner is not in the record on appeal, but the district court conducted an in camera inspection and determined that the planner did not contain trial strategy. Moreover, the district court declared that "[n]o one who read the planner

42

learned [anything] new about defendant's version of the events leading up to Mary's death. There is nothing in the planner that could be used to the defendant's detriment."

*Analysis*

Attorney-client privilege is a rule of evidence, codified in K.S.A. 2017 Supp. 60-426, which protects communications between an attorney and his or her client, protects the client from having to disclose the communications, and prohibits the attorney from disclosing the communications. It derives from the Sixth Amendment right to counsel. *Case v. Andrews*, 226 Kan. 786, 787, 603 P.2d 623 (1979). Only the client may waive the privilege. *State ex rel. Stovall v. Meneley*, 271 Kan. 355, 374, 22 P.3d 124 (2001). Here, Miller did not retain Regan, but in this context the attorney-client privilege protects the conversation between the two and no one argues otherwise. Nor does anyone argue that Miller waived his privilege. Further, none of the exceptions in K.S.A. 2017 Supp. 60-426(b) apply here.

In the ordinary scenario, the district court would have been presented with a motion to suppress the evidence in the planner as being obtained—albeit unintentionally—in violation of the attorney-client privilege. But the exclusion of the planner would have been ineffectual, given that its contents matched testimony at Miller's first trial. So the question is whether the appropriate remedy is to disqualify the DA's office.

Given the absence of support in this state for such a remedy, Miller resorts to cases in foreign jurisdictions. But they are factually distinguishable. In a general sense, this court has suggested that a breach of confidential information will not warrant a reversal when substantial justice has been done. *State v. Jenkins*, 272 Kan. 1366, 1385, 39 P.3d 47 (2002) (any purported error by Department of Revenue in releasing confidential driving records with medical information under K.S.A. 2000 Supp. 74-2012 in manslaughter case

43

stemming from vehicle crash would be harmless when not shown to have prejudiced substantial rights of the defendant). In this case, the prosecutor did not overtly and intentionally seek to violate the attorney-client privilege. While the DA's handling of the planner once its content was known can best be characterized as unprofessional, the absence of any showing of prejudice to the defense leads us to find that the district court did not abuse its discretion in refusing to disqualify the DA's office.

JUDICIAL MISCONDUCT

Miller argues that the trial judge, while ruling on three separate objections during closing argument, improperly advanced an interpretation of the evidence that was not supported by the record, prejudicing the defendant's substantial rights. The State counters that the trial judge's direct responses to counsel's objections properly served as the ruling on each objection.

*Standard of Review*

Appellate courts exercise unlimited review of the particular facts and circumstances of each case to determine whether judicial comments, other than jury instructions, rise to the level of judicial misconduct. *State v. Kemble*, 291 Kan. 109, 113, 238 P.3d 251 (2010). The party alleging judicial misconduct bears the burden of establishing that misconduct occurred and that the misconduct prejudiced the party's substantial rights. See *Hudgins,* 301 Kan. at 637-38. But if a proper and reasonable interpretation will render the judge's remark unobjectionable, the remark cannot be found to be prejudicial. *Kemble*, 291 Kan. at 113; see also *State v. Miller*, 274 Kan. 113, 118, 49 P.3d 458 (2002) (the "[m]ere possibility of prejudice from a judge's remark is not sufficient to overturn a verdict or judgment").

44

*Analysis*

We first note that Miller did not raise the issue below or contemporaneously object to the trial judge's rulings. This court, however, has reviewed allegations of judicial misconduct, despite the lack of a contemporaneous objection, when the defendant claims a violation of his or her right to a fair trial. See, e.g., *Kemble*, 291 Kan. at 113; *State v. Tyler*, 286 Kan. 1087, 1090, 191 P.3d 306 (2008). Accordingly, we will review Miller's claim.

We begin with an overview of a trial judge's role in a jury trial, which is not to simply moderate the trial. The judge should endeavor to conduct the trial in an atmosphere of impartiality and, therefore, should refrain from remarks or conduct that may injure a party. The judge should be the exemplar of dignity and impartiality, should exercise restraint over personal conduct and statements, should avoid personal predilections, and should control personal emotions. The judge should not permit any person in the courtroom to embroil him or her in conflict. The judge should avoid behavior that tends to demean the proceedings or to undermine the judge's authority. When it becomes necessary during the trial to comment upon the conduct of witnesses, spectators, counsel, or others, or upon the testimony, those comments should be made in a firm, dignified, and restrained manner, avoiding repartee. The judge's comments and rulings should be limited to what is reasonably required for the orderly progress of the trial and should refrain from unnecessary disparagement of persons or issues. *State v. Hayden*, 281 Kan. 112, 125, 130 P.3d 24 (2006). In short, our system places an onerous duty on our trial judges, requiring a Herculean effort.

We look first at the court's alleged improper ruling when Miller objected to the prosecutor misstating the record regarding Dr. Osorio's testimony during closing argument. At trial, the prosecutor had challenged Dr. Osorio's certainty that Mary had

suffered a seizure, given that she had never been diagnosed with epilepsy or ever reported having a seizure. During closing, the following exchange occurred:

> "[MR. SIMPSON, prosecutor:]  And Dr. Osorio testified that up to ten out of a thousand people who are diagnosed with epilepsy will die from a seizure. People diagnosed with epilepsy, up to ten to a thousand—out of a thousand. That's not Mary Miller. She's not diagnosed with epilepsy. And when asked, well, what would it be for someone who didn't have epilepsy, we never really got an answer on that.

> "MR. NEY [defense counsel]:  Well, I'm going to object, Your Honor. That's not true. Dr. Osorio answered that question.

> "MR. SIMPSON:  Your Honor, I think that's accurate. [Dr. Osorio] didn't give a specific answer about those odds.

> "THE COURT:  *I don't recall that he did*." (Emphasis added.)

Miller complains that the record indicates Dr. Osorio testified that 10% of the general population, or 32 million people, will have one epileptic seizure in their lifetime despite not being diagnosed as epileptic, and that some of those seizures "could be a fatal seizure."

Of course, we have the benefit of the trial transcript. During the cross-examination of Dr. Osorio, the State elicited testimony from Dr. Osorio that the specific odds of someone *diagnosed* with epilepsy dying from a seizure would be "zero to ten in a thousand." The State then attempted to have Dr. Osorio answer whether the odds were lower for someone *not* diagnosed with epilepsy, but Dr. Osorio would not limit his response to that subset. The testimony Miller relies upon did not answer the specific question posed. Consequently, the objection—"Dr. Osorio answered that question"—was properly ruled on by the court's correct recollection that the doctor did not, in fact, answer the State's specific question.

46

Next, the State's closing argument focused on the evidence supporting Miller's motive to kill his wife and the following exchange occurred:

"[MR. SIMPSON:]  But, it's not just about [Lester] because you heard evidence about other things he could do that he had to hide from his wife. So, he's on these dating websites. He's having profiles. He's getting e-mails from the dating websites. So it's not just [Lester].

And then once Mrs. Miller is dead, what happens? [Miller] strikes up a new relationship [with] Laura [Miller]. He wanted to have fun. He wanted to do what—

"MR. NEY:  Objection. There is no evidence of that.

"THE COURT:  Someone was coughing and I couldn't hear the sentence.

"MR. SIMPSON:  I said he wanted to have fun.

"MR. NEY:  Objection. There is no evidence . . . the relationship with Ms. [Laura Miller] at that time was anything other than what she testified to.

"THE COURT:  *There is the Dream of Roses document that talks about Ms. [Laura Miller] replacing Ms. [Lester]*. So the objection is overruled.

"MR. SIMPSON:  And, ladies and gentlemen, when I'm saying he wanted to have fun, I'm talking broadly. Not just specifically." (Emphasis added.)

Miller argues that it was improper for the trial judge to give her opinion that the "Dream of Roses" letter written months after Mary's death was evidence of a "romantic" relationship between Miller and Laura Miller after Mary died. He points to Laura Miller's testimony that after Mary died she strictly acted as a "caregiver" to Miller two to three

days a week and that it would have been inappropriate to engage in a relationship that involved "companionship."

But Laura Miller's testimony as to her intentions for the relationship does not negate an inference that the defendant wanted to have fun. Moreover, the Dream of Roses document was evidence in the record, and the jurors were free to make of it what they would. The district court did not refer to a "romantic relationship," and it said nothing that misstated or mischaracterized the evidence. No error there.

The final alleged improper ruling occurred during Miller's closing argument when defense counsel questioned the weight the jury should put on Dr. Mitchell's testimony by highlighting that Dr. Wecht testified about anaphylactic shock and herbal remedies as being a potential cause of Mary's death. Defense counsel pointed out that Dr. Mitchell had detectives collect the herbal remedies from the Millers' home and that Detective Zachariah Thomas had testified about an email he sent to the State discussing the potential testing of the herbal remedies collected. Defense counsel then argued, "And why are you even checking with labs who can do this process months later if it's unimportant?" The State objected, arguing, "There's been no testimony that there was a lab that could do this." Defense counsel responded, "They were checking about labs." The trial court sustained the objection, ruling, "*There has been no evidence*." (Emphasis added.) Defense counsel continued with his closing argument: "Why are you sending e-mails around months later about the possibility of testing if it's unimportant? And then there was evidence that there was a name of a lab in that e-mail."

Miller argues that Detective Thomas did testify on direct examination that when he checked into the possibility of testing the herbal remedies he put the name of a lab—Willow Grove National Medical Services—in the email. That argument is unavailing for multiple reasons.

48

First, Miller did not include a copy of the email, or Defendant's Exhibit A, in the record on appeal. The burden is on the party making a claim of error to designate facts in the record to support that claim; without such a record, the claim of error fails. See *State v. Sisson*, 302 Kan. 123, 128, 351 P.3d 1235 (2015).

Second, the email was ruled to be impermissible hearsay evidence, but Miller got information contained in the email admitted by alleging that it was not being offered to prove the truth of the matter asserted therein, but rather to establish what caused the email to be sent. Accordingly, if the truth of the matter asserted in the email was inadmissible, it does not constitute evidence that there was a lab.

Third, Detective Thomas did not definitively testify that the lab identified in the email could do the necessary testing; he stated only that he had passed on the name of the lab. In fact, when Dr. Mitchell testified as to receiving the email, he stated that the lab mentioned in the email was not able to do the testing. In short, Miller appears to play fast and loose with the facts in making this claim.

In sum, the trial judge's response to each of the three objections, when taken in proper context, was not erroneous, much less misconduct. The trial judge did not inject herself and her personal beliefs and observations into the trial and, instead, limited her rulings to what was reasonably required for the orderly progress of closing arguments. Cf. *State v. Hamilton*, 240 Kan. 539, 547, 731 P.2d 863 (1987) (judge's numerous personal comments on evidence and interruptions of defense counsel were not impartial behavior). Miller's claim of judicial misconduct fails.

STATE'S FAILURE TO PROVE A HOMICIDE

Miller challenges the expert opinion of the State's forensic pathologist, Dr. Erik Mitchell, that Mary's death was a homicide. He argues that the medical evidence,

49

standing alone, was insufficient to establish that the victim had been killed by another. Therefore, Miller contends that Dr. Mitchell had to improperly pass on the credibility of the defendant and weigh disputed evidence to support his homicide opinion, rendering that expert opinion testimony inadmissible. He then attempts to spin the admissibility of evidence challenge into a sufficiency of the evidence issue by arguing that, without Dr. Mitchell's inadmissible opinion testimony, the State did not prove the death was a homicide.

We must necessarily begin by considering defendant's challenge to Dr. Mitchell's expert testimony. If the pathologist's opinion that the death was a homicide is ruled admissible, his testimony would constitute the requisite substantial competent evidence to support that element of the crime. Yet, before we can analyze the merits of Miller's evidentiary challenge, we must resolve the State's claim that Miller did not preserve that issue for appeal.

K.S.A. 60-404 generally precludes an appellate court from reviewing an evidentiary challenge absent a timely and specific objection to the admission of evidence made on the record when the evidence is presented at trial. *State v. Dupree*, 304 Kan. 43, 62, 371 P.3d 862 (2016); *State v. Richmond*, 289 Kan. 419, 428-30, 212 P.3d 165 (2009). Some six years before Miller's retrial, this court expressed its intent to require strict compliance with the statutory contemporaneous objection rule: "From today forward, in accordance with the plain language of K.S.A. 60-404, evidentiary claims—including questions posed by a prosecutor and responses to those questions during trial—must be preserved by way of a contemporaneous objection for those claims to be reviewed on appeal." *King*, 288 Kan. at 349.

During the direct examination of Dr. Mitchell, the State asked the pathologist whether, after completing his autopsy of the victim, he had reached a conclusion "to a reasonable degree of medical certainty about Mary Miller's cause and manner of death."

50

Dr. Mitchell responded that Mary "died of an asphyxial death . . . by someone else." When asked why he arrived at his conclusion, Dr. Mitchell testified:

> "I have the anatomic positive indicators of pressure to the neck. I have no indication of any other process that can kill her. And investigatively, *I have indications that the—there is denial of presence of another adult in the house when, in fact, there is evidence that that adult was present. There is no indication that the police have ever related to me of any other, especially adult person, being in the house at that time*." (Emphasis added.)

Miller did not object to this testimony. He did not challenge the foundation for the doctor's opinion; he did not complain that the testimony was outside the permissible scope of K.S.A. 60-456 expert testimony; and he did not argue that Dr. Mitchell was invading the province of the jury.

Instead, Miller proceeded to cross-examine Dr. Mitchell in a manner that attempted to solidify the notion that the pathologist had based his autopsy conclusion on nonmedical investigatory information. Specifically, the cross-examination clarified that Dr. Mitchell had relied, in part, on the context provided by Miller's denial that he was present in Mary's room which was contradicted by information from the children. The doctor conceded that, without the background information, the straight anatomical information revealed by the autopsy was suspicious, but not enough for the doctor to have made the decision that the death was caused by a homicidal strangulation.

On redirect, the State revisited Dr. Mitchell's cross-examination responses and asked Dr. Mitchell what significance he placed on the information that Miller denied being in Mary's room when he could have been present at her death. Miller objected that Dr. Mitchell was giving his opinion on the evidence, which went beyond the field of forensic pathology. The State responded that Miller opened the door during cross-examination to its line of questioning. The trial court overruled the objection, stating that

51

Dr. Mitchell "was qualified as an expert in the field of medicine as a doctor, not just a pathologist."

On recross-examination, Miller again elicited testimony from Dr. Mitchell that Miller's denial of being in the room with Mary influenced his determination of the cause of death. He did not seek to have the doctor's cause-of-death opinion stricken.

During re-redirect, the State asked Dr. Mitchell if he would change his opinion if there was a report that Miller was in the room with Mary when she cried out about having trouble breathing. Dr. Mitchell testified he would not, "[b]ecause I've got somebody who denies being there." At this point, Miller made the objection that Dr. Mitchell was invading the province of the jury. The State again countered with its "opened-the-door" argument, but the trial court sustained the objection on the basis that the question had been asked and answered. The State then asked Dr. Mitchell why he found Miller's denial of being in the room important, to which Miller objected that Dr. Mitchell was commenting on Miller's "behavior and why it is important." The trial court overruled the objection, holding that the State on re-redirect could ask Dr. Mitchell questions on the same subject that Miller had raised in his recross-examination.

Miller did not object to Dr. Mitchell's cause-of-death opinion until the basis for that opinion had been thoroughly parsed and interminably repeated through multiple examinations by both parties. That tack does not comport with this court's notion of timeliness.

"Our caselaw regarding the necessity of contemporaneous objections is clear. 'The contemporaneous objection rule requires each party to make a specific and timely objection at trial in order to preserve evidentiary issues for appeal. K.S.A. 60-404. The purpose of the rule is to avoid the use of tainted evidence and thereby avoid possible reversal and a new trial.' *Dukes*, 290 Kan. at 488 (citing *State v. King*, 288 Kan. 333, 342, 204 P.3d 585 [2009]). This rule not only gives the trial court the opportunity to address

52

the issue, but practically it also constitutes "'one of necessity if litigation is ever to be brought to an end.'" *State v. Fisher*, 222 Kan. 76, 83, 563 P.2d 1012 (1977)." *State v. Brown*, 307 Kan. 641, 645, 413 P.3d 783 (2018).

Miller contends that we should consider his objection timely because he was surprised by the pathologist's revelation that his opinion had factored in nonmedical background information. That argument is unpersuasive on more than one level. It should be no surprise that the context in which a death occurs is relevant to determining the manner of death. Further, this was a retrial and the defense should have had ample access to the autopsy report and other information. But more importantly, the State teed up a defense objection on the basis of an inadequate foundation for the expert's opinion when it asked Dr. Mitchell, *on direct examination*, why he concluded the death was a homicide. That was the time to challenge the cause-of-death opinion and avoid the use of potentially tainted evidence.

We note that the issue is not presented to us as an appeal of the district court's denial of a motion for mistrial. It is presented as an evidentiary question. As presented, then, we find that the issue was not properly preserved under the mandate of K.S.A. 60-404 and we decline to review the merits of the claim.

DENIAL OF MISTRIAL MOTIONS

Miller contends that the trial court erred in denying his two motions for mistrial. One motion was prompted by the prosecutor's mention of pornography, which violated the district court's order in limine prohibiting evidence of "commercial pornography." The other mistrial motion was in response to the State's rebuttal witness, who allegedly testified outside the scope of permissible rebuttal.

53

K.S.A. 22-3423(1)(c) authorizes the district court to declare a mistrial if prejudicial conduct occurs, either inside or outside the courtroom, that makes it impossible for the trial to proceed without injustice. In evaluating a motion for mistrial under K.S.A. 22-3423(1)(c), the trial court first determines whether prejudicial conduct resulted in a fundamental failure in the proceeding. If so, the trial court considers whether an admonition, jury instruction, or other action can remove or sufficiently mitigate the damaging effect of the prejudicial conduct. Ultimately, the court must decide whether the fundamental failure in the proceeding makes it impossible to continue the trial without injustice, in which event the court should declare a mistrial. *State v. Moyer*, 306 Kan. 342, 356, 410 P.3d 71 (2017) (citing *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 [2011]).

*Standard of Review*

A trial court's decision denying a motion for mistrial is reviewed under an abuse of discretion standard. *Moyer*, 306 Kan. at 355-56. An appellate court divides the application of the abuse of discretion standard into two parts:  (1) Did the trial court abuse its discretion when deciding whether there was a fundamental failure in the proceeding? and (2) Did the trial court abuse its discretion when deciding whether the conduct caused prejudice that could not be cured or mitigated through admonition or jury instruction, resulting in an injustice? 306 Kan. at 356; *Ward*, 292 Kan. at 551.

*Analysis*

*Prosecutorial Error*

In Miller's appeal of his first conviction, the admissibility of commercial pornography found on his computer was an issue. Before the retrial, Miller moved to prohibit the State from offering any evidence of "commercial pornography" seized from

54

his computer. The district court granted that motion in limine, finding the evidence irrelevant and unduly prejudicial.

In its case-in-chief, the State called the detective who had examined the four computers seized at the Millers' residence. During the direct examination of that detective about the children's computer, the prosecutor asked the detective: "[D]id you find any *pornography* or anything like that on the computer?" (Emphasis added.) The detective responded that he did not.

Whereupon, the trial court called a bench conference to admonish the prosecutor: "Do not mention pornography." Miller, then, moved for a mistrial. He argued that, given the prosecutor had already informed the jury that there were four computers, the question was intended to lead the jury into inferring that the remaining three computers contained pornography. The prosecutor responded that he had not violated the order in limine because he did not say "commercial pornography"; the jury had already been presented evidence of "personal pornography"; and the prosecutor was targeting his question at any pictures depicting Miller and Lester together.

The trial court denied Miller's request for a mistrial, but it directed the prosecutor to inform the jury: "What I was asking was concerning photos of Mr. Miller and Ms. [Lester]. I inartfully called it pornography. That was the wrong term to use. I was simply asking about photos of those two people." Miller took issue with the prosecutor describing pictures of him and Lester as pornography. The prosecutor complied with the court's direction without using the word, "pornography," and asked the detective whether he had seen "any photographs on that computer" of Miller and Lester. Again, the detective responded, "I did not."

The first step in a mistrial analysis is to determine whether there was a fundamental failure in the proceedings. When a prosecutor introduces, or attempts to

55

introduce, evidence that the district court specifically prohibited by an order in limine, a fundamental failure in the proceedings has occurred. The State's argument that the question about "pornography" did not violate the limine order prohibiting mention of "commercial pornography" did not persuade the trial court. Nor are we persuaded by that hair-splitting. To borrow the defense's descriptor, the argument "is, at best, sophistry."

Likewise, the prosecutor's explanation that he was simply trying to ascertain from the detective whether pictures depicting Miller and Lester together were on the children's computer is disingenuous. Through Lester, the State had already admitted the suggestive photographs of Miller and Lester depicted in State's Exhibits 49 and 50, as well as the five photographs of Miller and Lester performing a ceremony together depicted in State's Exhibits 51-55. The prosecutor simply could not have had a good faith belief that the "pornography" question served any valid evidentiary purpose.

The next step is to determine whether the fundamental failure requires reversal. Here, the district judge took immediate action to remediate the problem. She called for a bench conference to prevent any further violations of the order in limine and then directed the prosecutor to inform the jury of the proper scope of the inquiry. With that cure, we are convinced that the error was harmless.

*Scope of Rebuttal Testimony*

Miller claims that it was a fundamental failure in the proceedings when the trial court permitted improper rebuttal expert testimony. K.S.A. 2014 Supp. 60-226(b)(6)(C)(ii) requires disclosure of expert testimony intended "solely to contradict or rebut" other expert testimony. In *State v. Boleyn*, 297 Kan. 610, 624-25, 303 P.3d 680 (2013), we explained:

"'Rebuttal evidence is that which contradicts evidence introduced by an opposing party. It may tend to corroborate evidence of a party who first presented the evidence on the particular issue, or it may refute or deny some affirmative fact which an opposing party has attempted to prove. It may be used to explain, repel, counteract, or disprove testimony or facts introduced by or on behalf of the adverse party.'"

The use and scope of rebuttal evidence rests in the sound discretion of the trial court, and its ruling will not be reversed unless it appears that discretion has been abused to the prejudice of the defendant. *State v. Cosby*, 285 Kan. 230, 250, 169 P.3d 1128 (2007). A judicial action constitutes an abuse of discretion if (1) no reasonable person would take the view adopted by the trial court; (2) the action is based on an error of law; or (3) the action is based on an error of fact. *Marshall*, 303 Kan. at 445.

Parties must disclose their experts before trial in the time and sequence as ordered by the trial court. K.S.A. 2014 Supp. 60-226(b)(6)(C). In *State v. Drach*, 268 Kan. 636, 646, 1 P.3d 864 (2000), this court recognized "[b]ecause the purpose of a rebuttal witness is to refute testimony given in the case in chief, it would be hard to list rebuttal witnesses in advance, not knowing exactly what detailed testimony may be elicited during the case in chief."

Due to the untimeliness of the State's disclosure of its rebuttal expert witness, the trial court limited Dr. Sperry to attacking any factual disagreements he had with the defense experts' opinions. See K.S.A. 2014 Supp. 60-226(b)(6)(C). The trial court ruled that Dr. Sperry cannot "say what he thinks [is] the cause of death" or "give his opinion on the ultimate cause of death." The trial court further clarified that Dr. Sperry could only address his disagreement with the defense experts' opinions as to the underlying facts, "[n]ot because he thinks it's something different, but because they have no basis in medicine, because they are not supported by the evidence. But not because he came to a different conclusion."

57

The prosecutor began rebuttal examination by asking Dr. Sperry whether he disagreed with Dr. Wecht's opinion that "the injuries in the neck muscle of Mrs. Miller were an artifact." The jury had previously been told that an artifact was "a bruise that isn't real." Dr. Sperry stated that he disagreed. The prosecutor then asked, "And without stating your own opinion, what's the basis of your disagreement?" Dr. Sperry described why he believed that Dr. Wecht incorrectly identified the muscle where the hemorrhage was and then stated, "[T]he hemorrhage is in a different muscle than what [Dr. Wecht] described over and over," and "it is a true hemorrhage." Miller objected and the trial court overruled his objection without discussion.

Thereafter, Dr. Sperry testified about a photograph depicting the hemorrhage and stated that the hemorrhage was "going into the muscle itself and that is what Dr. Mitchell actually described in his autopsy report as extending into what he called the belly of the muscle, which is the muscle itself. And that is the result of true—." Miller interrupted, objected, and began to move for a mistrial. The trial court told Miller, Dr. Sperry "hasn't said it yet so there is no cause for a mistrial." The trial court then instructed the State to explain to Dr. Sperry that he was limited to testify about the defense experts, "not . . . what Dr. Mitchell did." Miller moved for a mistrial, arguing that Dr. Sperry said "that is a true—." The trial court denied Miller's motion, ruling that Dr. Sperry "didn't say anything else. We don't know if it's a true what."

Miller does not fully explain why he believes that Dr. Sperry's veering toward a blocked pathway constituted a fundamental failure in the proceedings. But nevertheless, we can declare that any such failure was harmless.

MOTIONS IN LIMINE AND ADMISSIBILITY OF EVIDENCE

Miller filed pretrial motions in limine, seeking to exclude certain evidence. Specifically, he challenged evidence of: (1) Miller's extramarital affair with Lester;

58

(2) Miller's accessing dating websites; and (3) Miller being the beneficiary of Mary's life insurance policies, as well as challenging the introduction of graphic photographs depicting Miller in bondage and engaged in a sex act. He preserved those challenges by objecting at trial to the introduction of the evidence. See K.S.A. 60-404; *State v. Sprague*, 303 Kan. 418, 432-33, 362 P.3d 828 (2015) (when the trial court defers ruling on a motion in limine, the moving party must make a timely and specific objection at trial to the admission of the evidence to preserve the issue for appeal). Ultimately, then, our determination focuses on the admissibility of the challenged evidence.

*Standard of Review*

In reviewing the admissibility of evidence, the court first determines whether the challenged evidence is relevant, i.e., whether the evidence is probative and material. The trial court's determination that the evidence is probative is reviewed for an abuse of discretion; materiality is subject to de novo review. If the evidence is relevant, the court then determines, de novo, which rules of evidence or other legal principles apply. Appellate review of the trial court's application of the applicable legal rules and principles depends upon whether the rule or principle permits the trial court to exercise its discretion (abuse of discretion review) or whether the rule raises questions of law (unlimited review). *State v. Frierson*, 298 Kan. 1005, 1015, 319 P.3d 515 (2014). Moreover, when a party argues that otherwise relevant photographs should have been excluded as unduly prejudicial, e.g., because they were overly repetitious, gruesome, or inflammatory, our review is for an abuse of discretion. *State v. Soto*, 299 Kan. 102, 112, 322 P.3d 334 (2014).

*Analysis*

Generally, all relevant evidence is admissible. K.S.A. 60-407(f). Relevant evidence is evidence having "'any tendency in reason to prove any material fact.'" *State v.*

*Page*, 303 Kan. 548, 550, 363 P.3d 391 (2015) (quoting K.S.A. 60-401[b]); see *State v. Lowrance*, 298 Kan. 274, 288, 312 P.3d 328 (2013) ("To determine if evidence is relevant a trial judge must evaluate whether there is a material or logical connection between the asserted facts and the inference or result the facts are intended to establish."). "Photographic evidence, like other evidence offered at trial, is relevant and generally admissible if the photographs have a reasonable tendency to prove a material fact in the case." *State v. Rodriguez*, 295 Kan. 1146, 1157, 289 P.3d 85 (2012).

The definition of relevance encompasses two elements:  a materiality element and a probative element. Evidence is material when the fact it supports is in dispute or in issue in the case. *State v. Bowen*, 299 Kan. 339, 348, 323 P.3d 853 (2014). Evidence is probative if it has any tendency to prove any material fact. *Dupree*, 304 Kan. at 64. Even if evidence is relevant, a trial court has discretion under K.S.A. 60-445 to exclude such evidence where the court finds its probative value is substantially outweighed by its potential for producing undue prejudice. *Lowrance*, 298 Kan. at 291. We will individually address each category of evidence under the foregoing process.

*Evidence of Extramarital Affair*

Miller sought to exclude all evidence associated with his extramarital affair with Lester, including Lester's testimony, photographs, and the "Dream of Roses" letter in which Miller described how Lester had been replaced by Laura Miller as Miller's lover and how Miller had felt a sense of forgiveness when viewing a large concrete box covered with roses that he described as "Mary's box" during his dream. The district court allowed the evidence as relevant to motive and intent.

Miller's first tack is to argue that he stipulated that if Mary did not die from natural causes, he was the only person who could have caused her death. Therefore, motive and intent were not disputed material facts, rendering any evidence thereof irrelevant. The

short answer to that argument is the general rule that an offer to stipulate is merely an offer and the opposing party is not required to accept the offer. *State v. Colwell*, 246 Kan. 382, 385, 790 P.2d 430 (1990). The State was entitled to prove Miller's motive to kill Mary, despite the equivocal stipulation. As the district court held:

> "The State has the right to present its case as it sees fit, and if the State chooses to present its theory in full, it has the right to do that and to put everything in context and not to present it piecemeal. And so that then relates back to my earlier rulings as far as evidence that is admissible going to motive and intent."

Next, Miller concedes that this court previously held that the photographs depicting him and Lester in semi-nude positions and the "Dream of Roses" letter were relevant to motive and intent. See *Miller I*, 284 Kan. at 700-06. But he argues that we should not be controlled by that holding because *Miller I* did not use the correct standard of review; the *Miller I* court had concerns as to whether the issue had been properly preserved, and such concerns are not present here; and in *Miller I*, the defendant had not rendered motive and intent irrelevant with a stipulation, as was done on retrial. The distinctions Miller manufactures evanesce upon closer scrutiny. There is nothing to suggest that *Miller I* would have reached a different result if it had articulated the standard of review from *Frierson*; *Miller I* did not decide the issue on the basis of preservation; and we have already determined that the purported stipulation at retrial did not restrict the evidence the State could use to prove the crime. Miller has not convinced us to revisit the holdings from *Miller I*.

Miller's extramarital affair was relevant to establish motive. "'Motive is the moving power which impels one to action for a definite result. . . . Motive is that which incites or stimulates a person to do an action.'" *State v. Jordan*, 250 Kan. 180, 190, 825 P.2d 157 (1992) (quoting *State v. Ruebke*, 240 Kan. 493, 502, 731 P.2d 842). Lester's testimony about her affair with Miller included a description of how Miller delayed their initial plan for him to divorce Mary and be with Lester because of the stigma and

emotional trauma of divorce. Because homicide was a quicker, less expensive way for Miller to extricate himself from his marriage and free himself to pursue his life with Lester, the affair could provide the moving power to impel Miller to commit that crime. Thus, the affair made it more probable both that Mary's death was a homicide and that Miller was the killer, i.e., the evidence was relevant.

To the contrary, Miller argues that even if we find that motive was at issue at his retrial, the evidence of his extramarital affair with Lester lacked probative value, i.e., the affair had no logical tendency to prove Miller had a purported motive to kill Mary. To support his argument, Miller cites two cases from other jurisdictions, *Camm v. State*, 812 N.E.2d 1127 (Ind. Ct. App. 2004), and *Lesley v. State*, 606 So. 2d 1084 (Miss. 1992). Neither case provides persuasive authority for his proposition.

In *Camm*, the Indiana Court of Appeals held that something else had to accompany evidence of defendant's extramarital affair to make it admissible as proof of motive. 812 N.E.2d at 1133. Specifically, Miller quotes from the opinion that "evidence of a defendant's extramarital affairs should be accompanied by evidence that such activities had precipitated violence or threats between the defendant and victim in the past, *or* that the defendant was involved in an extramarital relationship at the time of the completed or contemplated homicide." (Emphasis added.) 812 N.E.2d at 1133. Of course, here, the evidence established that Miller's affair with Lester was ongoing at the time of Mary's death, which would satisfy the Indiana requirement for admissibility.

In *Lesley*, the Mississippi Supreme Court excluded evidence of affairs that occurred years before the planned murder of the defendant's husband. The court held that any evidence of extramarital affairs *other than the current affair with the defendant's coconspirator* were not part of any chain of events leading to the planned murder, lacked relevance, and were unduly prejudicial. 606 So. 2d at 1090-91. But, as noted, Miller's affair with Lester was current and part of the chain of events that led to the murder.

62

In short, the district court did not err in following the precedent laid down by *Miller I* and admitting evidence of Miller's affair with Lester for the purpose of motive. That evidence included the photographs and "Dream of Roses" letter that corroborated the testimony of the affair.

*Evidence of Accessing Dating Websites*

The detective that conducted a forensic examination of Miller's computer testified that Miller had created an email account under an alias entitled, "[alias]isfun@[domain name]." Miller had used the account to access such sites as PrimeSingles, AmericanSingles, and One2OneMatch. Some of the sites contained Miller's profile. But, pointedly, the detective testified there were no emails from the "[alias]isfun" email account contacting individuals from those websites.

Miller challenges the probative value of that evidence and contends that the prejudicial effect was extreme. The State counters that the evidence of Miller's active online dating profiles was relevant circumstantial evidence to show Miller's unhappiness with his marriage, his infidelity, and his desire to be with someone other than Mary. Moreover, the State argues that the evidence corroborated Lester's testimony that they had discussed Miller wanting to bring other women into their relationship before Mary's death. The district court found relevance because the way that Miller described his marital status online contrasted with his other statements about his marriage.

Miller makes a colorable argument. The probative value of the detective's testimony seems tenuous. Nevertheless, we accord the trial judge a great deal of deference in assessing probativity, applying an abuse of discretion review standard. Moreover, even if we were to declare the admission of this evidence to be erroneous, its innocuous nature would convince us that such an error would be harmless.

63

*Evidence of Life Insurance*

Miller also argues that evidence of the life insurance policy on Mary's life, which had been acquired approximately 8 years earlier as part of a husband and wife insurance plan, was not relevant to motive and was highly prejudicial. The trial court found the evidence was relevant to the question of motive, stating, "Although the State's theory is that [Miller] killed his wife to continue his double life or his affair with [Lester] or others, that takes money." The trial court clarified that it was for the jury to weigh any other possible explanations regarding Mary's life insurance policy.

At trial, the State established through Miller's financial advisor, Anthony Hayden, that the Millers both took out $300,000 life insurance policies in 1995, with each named as the primary beneficiary of the other's policy. In 2000, the Millers changed the contingent beneficiaries on their policies to a trust under their respective wills to benefit their children. Hayden further testified that Miller had phoned him within 24 to 48 hours of Mary's death to discuss Mary's life insurance policy and they then met approximately two months later about processing the policy.

Miller does not dispute the State's contention that the Millers "struggled financially." The idea that financial gain from a life insurance policy can provide a motive for murder is certainly not a new or unique concept. See, e.g., *State v. Boorigie*, 273 Kan. 18, 39, 43, 41 P.3d 764 (2002) (evidence of motive that defendant stood to profit from at least $1.4 million in life insurance proceeds if spouse died an accidental death); *State v. Lumbrera*, 257 Kan. 144, 145, 891 P.2d 1096 (1995) (State's theory that defendant had intentionally smothered her child to collect life insurance policy); *State v. Johnson-Howell*, 255 Kan. 928, 951-52, 881 P.2d 1288 (1994) (financial gain from insurance noted as partial motive for murder in conviction based on circumstantial evidence), *overruled on other grounds by State v. Jefferson*, 287 Kan. 28, 194 P.3d 557

(2008); *State v. Carpenter*, 215 Kan. 573, 574, 527 P.2d 1333 (1974) (partial motive for murder was to collect life insurance proceeds), *holding modified by State v. Arney*, 218 Kan. 369, 544 P.2d 334 (1975). The fact that the policy had been in effect for a number of years before Mary's death does not negate that its existence could provide a motive for murder. It was up to the jury to decide how much weight to allocate to that probative fact. The district court did not err in admitting evidence of the life insurance policy.

*Graphic Photographs*

Miller complains that photographs of him and Lester were repetitious and inflammatory and should have been excluded. That issue was thoroughly reviewed and discussed in *Miller I*, resulting in the following holding:

"Having reviewed the record in this case, we conclude that the six personal photographs, which depicted the defendant or the defendant and Parbs [Lester] semi-nude in suggestive positions, were relevant under the State's theory of the case to the issues of motive and intent. The photographs illustrate the intensity and nature of the defendant's post-marital relationship and provide a sharp contrast with the evidence regarding the defendant's marriage. The district court did not abuse its discretion in concluding that the defendant's personal photographs had 'a reasonable tendency to prove a material fact' in the case. *Mayberry,* 248 Kan. at 384.

"Moreover, contrary to the defendant's assertions, the six personal photographs were not introduced solely to demean or embarrass the defendant. These photographs are not extraordinarily graphic. They are therefore distinguishable from the evidence in *Taylor* and *Grannis,* where the courts noted that the *extreme* sexual character of the evidence in question (the story detailing the rape of young girls) or the social prejudice that may spring from such evidence (the homosexual pornography collection) rendered the evidence so prejudicial to call for reversal. The personal photographs here were not of that extreme character. In addition, though many people would disapprove of the defendant's extramarital affair, evidence of that affair was relevant to prove motive, and testimony regarding the affair had already been admitted without objection, mitigating

65

the photographs' prejudicial effect. The case is therefore distinguishable from this court's decision in *Leitner,* where 'the evidence of Leitner's practice of witchcraft was more prejudicial than probative' and 'had no direct relevance to the crime charged.' 272 Kan. at 416. We find that the district court did not abuse its discretion in admitting these six photographs." *Miller I*, 284 Kan. at 700-01.

On remand for a new trial, the district court applied the law that had been established in *Miller I*. That is exactly what is expected:

"Courts adhere to the law of the case "'to avoid indefinite relitigation of the same issue, to obtain consistent results in the same litigation, to afford one opportunity for argument and decision of the matter at issue, and to assure the obedience of lower courts to the decisions of appellate courts. [Citation omitted.]"' *Collier*, 263 Kan. at 631. These purposes have long been part of our state's judicial fabric. See *Headley v. Challiss*, 15 Kan. 602, 607 (1875) ('A party may not settle the law of his case by piecemeal before this court, any more than he may settle the facts in that way before the district court. When the case is tried, he must be prepared to present his entire claim, or his entire defense.').

"Our caselaw has applied the law of the case doctrine in various situations relevant to this appeal. One is in a second appeal brought in the same case. In that instance, the first decision is generally the settled law of the case on all questions involved in the first appeal and reconsideration will not normally be given to those questions. See *State v. Kleypas*, 305 Kan. 224, 244, 382 P.3d 373 (2016). Another is on remand to a lower court from an appellate court. In this situation, in the context of a trial court acting on remand from an appellate court, the so-called 'mandate rule' under K.S.A. 20-108 and K.S.A. 60-2106 compels the trial court to proceed in accordance with the mandate and the law of the case as established on appeal. See *Collier*, 263 Kan. 629, Syl. ¶ 4." *State v. Parry*, 305 Kan. 1189, 1194-95, 390 P.3d 879 (2017).

The district court's admission of the photographs is affirmed based on the law of the case.

66

ADMISSION OF DEFENDANT'S PRIOR TRIAL TESTIMONY

Miller testified at his first trial, but chose not to testify at his retrial. Over defense objection, the district court permitted the State to read a redacted version of Miller's testimony from the first trial (*Miller I* testimony). Miller contends that the trial court erred by admitting his *Miller I* testimony after the State violated discovery rules by not giving timely notice as to its intent to introduce his prior testimony, thus depriving the defense of an opportunity to establish that the prior testimony was the product of ineffective assistance of counsel.

In April and June of 2014, Miller filed discovery motions requesting, in part, copies of all "written or otherwise recorded" oral statements given by Miller, including statements in response to "questions." The State did not produce a transcript of his *Miller I* testimony. Yet, on the first day of the retrial, March 30, 2015, the State filed a motion to admit the *Miller I* testimony, arguing that *State v. Pabst*, 273 Kan. 658, 665-66, 44 P.3d 1230 (2002), held that such prior testimony was admissible at retrial.

Miller objected, arguing that the State's failure to provide the defense with a copy of Miller's prior testimony or proper notice that it intended to present his prior testimony denied Miller the opportunity to have a hearing on the question of whether his prior testimony should be excluded because of the ineffective assistance of his *Miller I* trial counsel. The trial court remedied the late notice by declaring that it would not rule on the motion until the defense could review it and respond with its arguments.

At the conclusion of the third day of retrial, the trial court heard Miller's arguments. The defense asserted that the trial court should exclude his prior testimony because the State had violated discovery rules and the resulting lack of prior notice denied him an opportunity for a meaningful hearing to determine whether his prior

67

testimony was a result of ineffective assistance of trial counsel. Miller also argued that a hearing was needed to further explore how the prosecutors' improper possession of privileged information from the investigator's lost day planner had tainted his *Miller I* testimony.

The trial court ruled the *Miller I* testimony admissible at retrial, based on several findings: (1) The *Miller I* testimony was not illegally obtained; (2) Miller acknowledged that he had independently obtained the transcript of the *Miller I* testimony prior to trial; (3) Miller had previously filed a K.S.A. 60-1507 motion which did not allege that his decision to testify at his first trial was coerced or influenced by the ineffectiveness of trial counsel; (4) the prosecutors in the DA's office did not learn anything from the investigator's planner that would have aided them in cross-examining Miller at the first trial; and (5) the *Miller I* trial transcript revealed that, prior to Miller's testimony at the first trial, the court elicited directly from Miller an affirmation that he understood his right not to testify and his right not to be compelled to testify.

During a subsequent recess, the trial court and parties agreed on the extent that Miller's 94 pages of prior testimony would be redacted for the jury. After the jury returned, the court reporter read Miller's redacted sworn testimony to the jury. As noted above, Miller elected not to testify at his retrial.

*Standard of Review*

Generally, when a party challenges the admission or exclusion of evidence on appeal, the appellate court's first inquiry is relevance, i.e., whether the evidence is probative and material. Here, however, there is no dispute that Miller's prior testimony was relevant. Rather, Miller contends that the *Miller I* testimony was obtained illegally because of ineffective assistance of counsel in the first trial and that the retrial court's failure to appropriately sanction the State for its discovery violations on retrial denied the

defense an opportunity to prove the *Miller I* testimony was legally infirm. K.S.A. 2017 Supp. 22-3212(i) gives a district court in a criminal case the option of a broad array of sanctions for discovery violations. Consequently, the sanction imposed is reviewed under an abuse of discretion review standard, so long as due process rights are not implicated. See *State v. Johnson*, 286 Kan. 824, 832, 190 P.3d 207 (2008).

*Analysis*

The State does not seriously contend that it fully complied with its statutory obligation under K.S.A. 2017 Supp. 22-3212(a)(1) to provide Miller with all known relevant written or recorded statements made by him. Rather, it takes the position that K.S.A. 2017 Supp. 22-3212(i) contains no procedural requirement for the retrial court to hold a hearing on an ineffective assistance of counsel claim against the first trial defense counsel, and that the trial court's decision in this case to allow Miller's retrial counsel to inspect the testimony and respond with arguments was a reasonable remedy of the discovery violation. We agree.

Obviously, the State understood that the *Miller I* testimony was not automatically admissible at retrial, because it filed a motion for court approval to admit the transcript, albeit not until the beginning of the trial. If the State had filed the motion in advance of trial, the defense would have been accorded the opportunity to fully prepare a defense to the admission of the transcript and argue that defense at a pretrial hearing. But the retrial court fashioned a reasonable remedy under the circumstances.

The court delayed ruling on the State's motion to admit the transcript, advising the defense it was being given time to review the *Miller I* testimony and to prepare its arguments in opposition to that motion. Subsequently, it gave the defense the opportunity to voice its objections to the admission of the transcript. Pointedly, the defense did not take the opportunity to make a record of its specific arguments as to how first-trial

69

counsel's performance was unconstitutionally ineffective and why that ineffectiveness voided testimony that was given under oath in open court. Under those circumstances, we cannot say that the district court abused its discretion in refusing to continue or suspend the trial for a separate hearing on the motion.

CUMULATIVE ERROR

Miller argues that, even if we determine that no individual trial error is sufficient to require a reversal of his conviction, the cumulative effect of multiple errors denied him a fair trial.

*Standard of Review*

The test is whether the totality of the circumstances establish that defendant was substantially prejudiced by the cumulative effect of multiple errors and was denied a fair trial. In assessing the cumulative effect of errors during the trial, the appellate court examines the errors in the context of the entire record, considering how the trial judge dealt with the errors as they arose; the nature and number of errors and their interrelationship, if any; and the overall strength of the evidence. *State v. Holt*, 300 Kan. 985, 1007, 336 P.3d 312 (2014).

*Analysis*

The trial errors we have declared are:  (1) the trial court's refusal to strike juror A.S. for cause; and (2) the prosecutor's violation of the limine order prohibiting any mention of pornography. In addition, we have left open the possibility of error by going straight to harmlessness on the rebuttal expert testimony of Dr. Sperry and on the admission of evidence of the defendant accessing dating websites.

Viewing the errors in the context of the entire record, we are convinced that the defendant was not so prejudiced by the cumulative effect of the errors as to deny him a fair trial.

The trial court contemporaneously dealt with each of the claimed errors as they arose: extracting a promise from A.S. to decide the case only on the evidence presented at this trial; directing the prosecutor to cure the erroneous mention of pornography; directing the prosecutor to advise Dr. Sperry of the proper scope of his rebuttal expert testimony; and making a considered analysis of the relevance of Miller's accessing dating websites. Moreover, the number and nature of the errors is minimal in relation to the number and nature of the issues raised in this case. Finally, the errors pale when weighed against the strength of the State's evidence, especially the testimony of the children present in the house at the time of death.

In sum, we affirm Miller's conviction on retrial.

Affirmed.

STEGALL, J., not participating.
WENDEL W. WURST, District Judge, assigned.[1]

---

[1]**REPORTER'S NOTE:** District Judge Wurst was appointed to hear case No. 114,373 vice Justice Stegall under the authority vested in the Supreme Court by art. 3, § 6(f) of the Kansas Constitution.

* * *

JOHNSON, J., dissenting:  I strongly suspect that yet another trial would yield the same result, i.e., Miller would be convicted of the first-degree premeditated murder of his wife, Mary. Yet, I cannot condone the conviction in this trial because it was fundamentally unfair, and, as my predecessor on this court, Justice Donald Allegrucci, so aptly declared:  "Denial of a fair trial violates the due process rights of the guilty defendant just as surely as those of the innocent one." *State v. Tosh,* 278 Kan. 83, 97, 91 P.3d 1204 (2004).

The notion that all persons, even those that actually committed the charged crime, are entitled to a fair trial is supported by a plain reading of the Fourteenth Amendment to the United States Constitution, which states, "[N]or shall *any* State deprive *any* person of life, liberty, or property, without due process of law." (Emphasis added.) No exception is made for those persons against whom the State has amassed overwhelming evidence. Indeed, the United States Supreme Court has interpreted "'person' in [the] ordinary sense of that term," and declared that the provisions of the Fourteenth Amendment "'*are universal in their application, to all persons within the territorial jurisdiction,* without regard to any differences of race, of color, or of nationality.'" *Plyler v. Doe*, 457 U.S. 202, 210-12, 102 S. Ct. 2382, 72 L. Ed. 2d 786 (1982). In that context, it is inconceivable to me that the framers of the Constitution intended to protect a person's liberty interests with a due process of law that is inversely proportional to the quantum of State's evidence.

The unfairness in this case starts with the retrial's venue. The defense presented an expert to testify about the results of the poll he conducted and to opine on the potential effects of the extensive publicity on the retrial. The State did not challenge that testimony with its own expert on the subject. Yet, the district court discounted this expert testimony, apparently choosing to substitute its own ideas on proper polling methodology for that of the Chairman of the Department of Communication Studies at the University of Kansas.

Nevertheless, it is difficult to fault the district court for denying a motion for change of venue. As the majority concedes, our precedent reveals that denying a change of venue virtually guarantees that the district court's ruling will be affirmed on appeal. But a long history of unfairness does not make it right in this case. See *State v. Carr*, 300 Kan. 1, 325, 331 P.3d 544 (2014) (Johnson, J., dissenting) (history of incorrectly decided cases not compelling; court not inexorably bound by erroneous or unsound rulings), *rev'd and remanded* 577 U.S. __, 136 S. Ct. 633, 193 L. Ed. 2d 535 (2016).

Here, however, we are not limited to speculating on the probability that pretrial publicity and preformed opinions of guilt might impact Miller's constitutional right to an impartial jury. The majority concedes that a juror who actually sat in judgment of Miller should have been stricken for cause. I agree that it was a fundamental error to allow A.S. to sit on the retrial jury.

> "And a fair trial requires that *all* of the jurors sitting in judgment of the criminal defendant must commence the trial presuming that the defendant is innocent. That initial state of mind is mandated because '[u]nder our theory of criminal jurisprudence in this nation, the defendant is clothed with a presumption of innocence until he is proven to be guilty beyond a reasonable doubt by the State.' *State v. Williams,* 229 Kan. 646, 663-64, 630 P.2d 694 (1981). It is not enough for a juror to be open to the possibility that the evidence presented at trial will dissuade the juror that the defendant is guilty. It is not enough for the juror to 'hope' that he or she will be able to set aside preconceived judgments of guilt or to 'try' to disregard inculpatory information to which the juror was exposed prior to trial. Instead, if a juror's state of mind with respect to the case or to the defendant is such as to create 'doubt that he [or she] can act impartially and without prejudice to the substantial rights of [the defendant],' the court has grounds to strike that juror for cause. K.S.A. 22-3410(2)(i) (setting forth one of the grounds for a challenge for cause). In short, the slate upon which the State shall write its guilt-proving evidence must be clean when the trial begins." *Carr*, 300 Kan. at 322-23 (Johnson, J., dissenting).

The district court repeatedly provided A.S. with the magic words which would permit the court to deny a challenge for cause, despite A.S. having knowledge of the previous conviction and an opinion of guilt that would always be in the back of his mind during trial. Cf. *Carr*, 300 Kan. at 325-26 (Johnson, J., dissenting) (suggesting error for trial court to lead venirepersons into saying magic words in order to pass mitigation-impaired jurors for cause or strike those with misgivings about death penalty). Moreover, one might find it ironic that the court passed for cause so many venirepersons with knowledge of the case and/or an opinion of guilt, given the court's earlier declaration that Dr. Beisecker's poll showed there were 42,550 Douglas County citizens with no knowledge of the case from which the court could reasonably expect to impanel an impartial jury. With so many "clean slate" persons to choose from, why did the trial court make a concerted effort to keep so many jurors from the group who had already formed an opinion about Miller's guilt?

Personally, I view the *Farrar* principle—that knowledge of a previous conviction is not inherently prejudicial—to be counterintuitive at best. A juror voting to convict a person who the juror knows was previously convicted by the juror's friends and neighbors is the path of least resistance. Bucking popular opinion requires a courageous independence. See *United States v. Williams*, 568 F.2d 464, 471 (5th Cir. 1978) ("[W]e are hard pressed to think of anything more damning to an accused than information that a jury had previously convicted him for the crime charged."); cf. *State v. Cook*, 281 Kan. 961, 971-72, 135 P.3d 1147 (2006) (distinguishing *Williams* because the controlling principle was applicable only in federal courts and because it involved media reports brought to court's attention before a verdict was reached whereas *Cook* involved whether a juror's posttrial affidavit warranted recall of the jury). Because *Cook* and *The State v. Farrar*, 103 Kan. 774, 176 P. 987 (1918), both involved posttrial motions as opposed to the voir dire challenge currently before this court, I would hold the cases are not dispositive of the question presented here. See *Cook*, 281 Kan. at 972; *Farrar*, 103 Kan. 774. Here, Miller was prejudiced.

Nevertheless, the problem in this case is our requirement that a criminal defendant—not the State that has the burden of proof—is required to cure a trial court's constitutional error. The trial court denied Miller his right to an impartial jury under the Sixth Amendment to the United States Constitution and Kansas Constitution Bill of Rights, § 10 by impaneling a juror who did not presume Miller to be innocent. The State could have cured that error by using a peremptory challenge to remove the biased juror. But the majority allows the State to use all 12 of its peremptory challenges on discretionary strikes, while requiring the defendant to give up a discretionary strike to cure the constitutional error caused by the court and the State. What is fundamentally fair about that?

While the denial of a trial by an impartial jury is egregious enough, standing alone, there was more. As the district court acknowledged, an assistant in the office of the District Attorney (DA) was "so improper and unseemly" in providing rent-free lodging to a principal State's witness in this case. Further, the office sat on evidence of privileged conversations Miller had with an attorney. Yet, when the DA learned of his assistant's conflict of interest, his first concern was that his office might be disqualified from the case. That seems to ignore our admonition that a prosecutor's interest "'in a criminal prosecution is not that it shall win a case, but that justice shall be done.' [Citation omitted]." *State v. Pabst*, 268 Kan. 501, 510, 996 P.2d 321 (2000).

Turning to the evidentiary issues, I agree that the testimony about Miller's accessing the dating websites is tenuous, at best. "The whole point of a relevancy inquiry is to determine whether there is some '"natural, necessary or *logical* connection"' between the proffered collateral facts and the point intended to be established. (Emphasis added.) *State v. Gauger,* 200 Kan. 563, 565, 438 P.2d 463 (1968) (quoting *In re Estate of Isom,* 193 Kan. 357, Syl. ¶ 2, 394 P.2d 21 [1964])." *State v. Miller*, 284 Kan. 682, 725, 163 P.3d 267 (2007) (Johnson, J., concurring) (*Miller I*). The evidence of visiting dating

75

websites, especially in light of no evidence of any emails contacting people on the websites, has no logical connection to a relevant fact in this case that would make it more likely that Miller killed his wife.

Likewise, the graphic photographs depicting Miller in bondage and engaged in a sex act were not *necessary* to prove the elements of the charged crime. At the very least, the prejudicial effect of the photographs substantially outweighed any need to establish the type of extramarital sexual relationship Miller had maintained. The law of the case doctrine is a prudential vehicle, and I would find it imprudent to apply it in this case.

Finally, I would consider Miller's challenge to Dr. Mitchell's expert opinion on the cause of death in assessing the impact of cumulative error. We state that the test is whether the *totality of the circumstances* establish that the defendant was substantially prejudiced by cumulative errors and was denied a fair trial. We are to examine the trial errors "in the context of the entire record." *Carr*, 300 Kan. at 251. The examination of the forensic pathologist is contained within the record, regardless of whether Miller contemporaneously objected. The doctor's own testimony calls into question whether his opinion was improperly based upon assessing witnesses' credibility and weighing conflicting evidence. That context should push this case over the line of acceptable prejudice to the side of reversibility.

In short, notwithstanding the practical and emotional costs of yet another retrial, our Constitutions require that result in order to maintain the integrity of our criminal justice system. See *Tosh*, 278 Kan. at 97 (recognizing that neither law nor basic justice can tolerate a rule that "the greater the evidence against a defendant, the less right that defendant has to a fair trial").

\* \* \*

WURST, D.J., dissenting: I agree with Justice Johnson's assessment that, if an erroneous expert opinion on cause of death is added to the cumulative error analysis in this case, the prejudice caused by the cumulative effect of all of the errors denied Miller a fair trial. Further, I agree that the record establishes that Dr. Mitchell's expert opinion—that the cause of death was asphyxiation by strangulation—was not based on medical evidence, but rather it was based on the doctor's factual determination that Miller had lied to the police about being in the room with his wife when she died. That factual determination required Dr. Mitchell to assess the witnesses' credibility and weigh conflicting evidence, each a responsibility well within the capability and province of lay jurors, rendering his expert opinion unnecessary and inadmissible.

But I would go one step further and hold that trial counsel's objections were sufficient to preserve the question as a stand-alone issue for appellate review. As Miller asserts in his reply brief, Dr. Mitchell did not testify about the basis of his cause-of-death opinion at the first trial; the basis for his opinion did not appear in the death certificate or in the autopsy report; and it was not until cross-examination of the State's expert that the defense learned that the anatomical evidence was insufficient for Dr. Mitchell to conclude, to a reasonable degree of medical certainty, that Mary Miller died of asphyxia. Then, when the defense objected, the district court still had time to avoid the use of tainted evidence and avoid possible reversal and a new trial. See *State v. McCaslin*, 291 Kan. 697, 707, 245 P.3d 1030 (2011) (explaining the purpose of the contemporaneous objection rule), *overruled on other grounds by State v. Astorga*, 299 Kan. 395, 324 P.3d 1046 (2014). Therefore, I would review Miller's challenge to Dr. Mitchell's expert opinion on the cause of death.

77